## CRANKE v. TRINITY GRAVEL CO. et al. (No. 9345.)

(Court of Civil Appeals of Texas. Dallas. March 14, 1925. Rehearing Denied May 9, 1925.)

**1. Brokers ⊕⇒53—Broker held efficient procuring cause of sale on terms satisfactory to owners.**

Broker *held* efficient procuring cause of sale of land on terms satisfactory to owners, and hence entitled to recover agreed commission or reasonable value of services.

**2. Brokers ⊕⇒57(2)—Right to compensation held not affected by sale by owner at lesser price and on different terms than stipulated by owner on listing land.**

That land was sold by owner to one introduced to him by broker at lesser price and on different terms than stipulated by owner when land was listed with broker did not affect latter's right to compensation for services rendered, where sale was made on terms satisfactory to owner.

**3. Brokers ⊕⇒57(1)—Right to compensation held not defeated by conveyance of land to corporation organized by purchaser.**

That land sold by owner to purchaser introduced by buyer was conveyed to corporation organized by such purchaser instead of to latter personally did not defeat broker's right to compensation, where corporation was organized through negotiations instituted by him simply as means to end desired.

**4. Brokers ⊕⇒45—Agency held not terminated by broker's statement that he did not think there was sale to subsequent purchasers.**

Broker's statement to owner, that prospective purchasers had no money and that he did not think there was a sale, *held* not to show termination of agency so as to defeat right to compensation, where sale was subsequently made by owner to such purchasers.

**5. Brokers ⊕⇒57(1)—Owners cannot refuse to pay broker on ground of no specific agreement to pay commission on sale finally made.**

Owners consummating sale, on terms satisfactory to them, to one introduced to them by broker, cannot refuse to pay latter on ground that there was no specific agreement to pay commission on sale made to corporation organized through negotiation between broker and purchaser to take title.

**6. Brokers ⊕⇒69—Broker held entitled to commission on cash consideration paid and debt assumed by buyer.**

Broker introducing one to whom owner sold land for cash, assumption of debt, and stock in corporation formed to take title, *held* entitled to agreed commission on cash consideration paid and debt assumed.

Jones, C. J., dissenting, and Looney, J., dissenting in part.

Appeal from District Court, Dallas County; T. A. Work, Judge.

Action by J. P. Cranke against the Trinity Gravel Company and others. Judgment for defendants, and plaintiff appeals. Affirmed as to named defendant, and reversed and rendered as to other defendants.

W. B. Hamilton, of Dallas, for appellant. Grover Adams, of Dallas, for appellees.

LOONEY, J. J. P. Cranke, appellant, sued Dan S. Harston, L. S. Brotherton, D. G. Smith, C. B. Van Deman, M. F. Smith, and the Trinity Gravel Company, an unincorporated association composed of the individuals above named, to recover judgment for the sum of $3,875, compensation claimed for procuring a purchaser for and assisting in making the sale of 471 acres of land situated near Arlington, in Tarrant county, Tex. Appellant alleged his cause of action in two counts—one based on an express agreement by appellees to pay 5 per cent. commission upon the price at which the land should be sold; the other based on a quantum meruit for the reasonable value of services performed in procuring a purchaser and in assisting in the sale of the land. The case was tried without the intervention of a jury; judgment was rendered in favor of appellees, from which this appeal is prosecuted.

[1] The evidence, in our opinion, justifies these conclusions: Mr. Harston, acting for himself and associates, the other appellees, listed the 471 acres of gravel land for sale with appellant, a real estate broker of Dallas, to be sold at $200 per acre, and agreed to pay him a commission of 5 per cent. of the sale price; that appellant procured the services of C. R. Chamblin, an engineer and gravel expert, had him examine the land with the view of ascertaining the extent it would produce gravel, and also to assist appellant in procuring a purchaser; that appellant, Mr. Chamblin and Mr. Harston, visited and inspected the land, with the result that, from the information obtained by inspection and from conversations with Mr. Harston, Chamblin was favorably impressed with the land as a gravel proposition, and authorized appellant to so quote him; that Cranke and Chamblin both interviewed W. E. Callahan, who was connected with the Callahan Construction Company, with the view of interesting him in the purchase of this land, and succeeded in so doing, introduced him to Harston, induced him to have the land tested for gravel, with favorable results, and, after bringing Callahan and Harston together, as the result of negotiations thus set on foot, a sale of the land was agreed on between appellees and Callahan, which comprehended the formation of a corporation styled Harston Sand & Gravel Company.

This corporation was formed for the pur-

pose of taking title to the land and developing it for the production and sale of gravel. The consideration agreed on between appellees and Callahan, or the company organized by Callahan to take title was $77,500, as follows: $10,000 cash, and equivalent, the assumption of an indebtedness against the land of $22,500, and stock in the Harston Sand & Gravel Company to the amount of $45,000. The company was chartered with an authorized capital stock of $120,000, and the land conveyed to it by appellees about January 1, 1923, on the terms and for the consideration named above.

Appellant's agreement of employment was made with Mr. Harston. In all acts, conversations, and negotiations with appellant, and with Chamblin and Callahan, Harston acted for himself and the other appellees; they were advised of the employment of appellant, the progress of the negotiations, and acquiesced therein.

Under the undisputed facts of this case, we find that appellant was the efficient procuring cause of the sale of the land, on terms satisfactory to appellees, and that the evidence justifies a recovery under either count of his petition.

[2] According to our view, it is wholly immaterial that the land was ultimately sold at a less price and on different terms from those stipulated by Mr. Harston when the land was listed with appellant, but the material facts that are decisive of the case are that, while his contract of employment was in force, appellant produced and introduced Callahan to Harston, as a prospective purchaser, to whom, after negotiations, a sale of the land was made on terms satisfactory to appellees, though different from those limited to appellant. The idea here advanced is sustained by the Supreme Court in Goodwin v. Gunter, 109 Tex. 56, 185 S. W. 295, in the following language by Chief Justice Phillips, to wit:

"It is no answer in such a case to say that a purchaser has not been produced by the broker ready, able, and willing to buy upon the terms limited by the contract, and the owner is therefore free to deal with the buyer, though produced by the broker, without any liability to the latter. That becomes unimportant in the face of the outstanding fact that it is by the broker the buyer is produced, and, before his negotiation is concluded, a sale is made, as the result of his effort, which is presumably just as satisfactory to the owner. The owner will therefore be deemed, in such a case, to have waived the terms to which the broker was confined, and the law declares him liable for the commissions fixed by the contract, for the reason that, except as to such waived provision, the broker's part of the contract has been fully performed. The decisions of this court clearly affirm this principle. It is recognized, generally, elsewhere; and nothing else could well be the law."

To the same effect is West Bros. v. Thompson & Greer, 48 Tex. Civ. App. 362,

106 S. W. 1134; Hancock v. Stacy, 103 Tex. 219, 125 S. W. 884; Bellis v. Hahn & Kendall (Tex. Civ. App.) 157 S. W. 427; Webb v. Harding (Tex. Com. App.) 211 S. W. 927; Keener v. Cleveland (Tex. Com. App.) 250 S. W. 151.

[3] Nor is it an answer to appellant's demand for compensation to say that the land was conveyed to a corporation organized by Callahan, instead of to Callahan in person. The organization of the corporation evolved from negotiations set on foot by appellant, and was simply a means to the end desired. The language of the Supreme Court of Nevada, in Page v. Sutton, 45 Nev. 395, 204 P. 881, 207 P. 1102, is quite to the point. The court said:

"Conceding that a company was organized after Mr. Page had been employed to procure a purchaser for the property, and that the property was in fact transferred to the corporation and the stock in the company sold to Loring instead of the property itself, to hold that the plaintiff could not recover because of this fact would be to put a premium upon chicanery. To approve such a theory would enable a seller of property through an agent to defeat a claim for commission in every instance. All the principal would have to do would be to organize a corporation to take over the property and then transfer the stock. No such transaction can be looked upon with tolerance by a court of justice."

The case of Fouke v. Jordy, 289 F. 220, from the Circuit Court of Appeals (Fifth Circuit) is very similar to the case under consideration. As the result of negotiations, between the purchasers produced by the broker and the owners of the property, a corporation was organized to which the properties were conveyed by the owners in consideration of a cash payment, the assumption of an indebtedness, and stock in a newly formed corporation.

The court held that this was a sale within the meaning of the contract between the broker and the owners, using the following language:

"We are of opinion that the transactions between defendants and the parties produced to him by the plaintiff constituted a sale. The title was conveyed to a corporation organized and financed by the parties, whom the plaintiff interested as prospective purchasers."

[4] Mr. Harston, speaking for himself and his associates, attempted to justify their refusal to pay appellant a commission, on the ground that the contract with appellant came to an end, and that thereafter he negotiated the sale with Callahan, unaided by appellant. The evidence bearing on this point is as follows: Mr. Harston testified:

"In something like three weeks, or probably a month (after appellant began efforts to sell the land), Mr. Cranke came into my office and said: 'Mr. Harston, those people [meaning Callahan and his associates] haven't got any money. I don't think there is a sale.' So I

said, 'All right,' and then, after that, Mr. Callahan and I got to talking about it. * * * The way I understood it, that ended any relation with him; then Mr. Callahan and I began to form a company, to organize a gravel company, and then I dropped down from $94,000 to $77,000 and put it [the land] in the company. During all the time I was talking to Mr. Callahan and in my dealings and investigations with him, Mr. Cranke was not helping in that matter and I didn't even consider him as being in it at all. * * *

"Q. Mr. Cranke talked to you several times during the time these negotiations were going on about the forming of the company, didn't he? A. No, sir; I don't think he was ever in there to my knowing after he came in there that day and said it was off.

"Q. He didn't say the deal was off, did he? A. He said, 'Those fellows haven't got any money;' he meant Callahan and the Callahan Construction Company. I considered it off when he said that; that was the conclusion I drew from it; I never talked to Cranke any more about it; When I considered the sale off, then I began negotiations to form this company with Mr. Callahan; I never told Mr. Cranke that the negotiations were off; I supposed he knew about it."

The refusal of appellees to compensate appellant must find justification, if at all, in the reasons thus stated by Mr. Harston.

An authority in point is Weidemeyer v. Woodrum, 168 Mo. App. 716, 154 S. W. 894. In that case the agent had performed all that was required to earn a commission, that is, he had produced a purchaser with whom the owner, after negotiations, made a sale. The broker, it seems, was ignorant of the fact that a sale was about to be consummated, and wrote to the owner, expressing the opinion that there was nothing to the proposed purchaser; that it (the company) had nothing. A trade was made, however, and the broker sued for his commission. The case was defended on the ground that the broker abandoned his efforts to bring about a trade. The Kansas City Court of Appeals, denying this contention, said:

"In the midst of these efforts, and as a direct result of them, defendant finds a deal which he can accept, but which all parties seem to have endeavored to carefully conceal from plaintiff. Plaintiff has already done what was required of him, but does not know it, and, impatient at the delay, he writes this letter, expressing his impatience. This letter had no effect whatever on the trade, as the contract therefor had already been signed, and the trade was finally perfected in a few days. Under these circumstances his letter was not an abandonment of his agency, and he is not to be denied a recovery upon that ground."

In answer to a similar defense in Sallee v. McMurry, 113 Mo. App. 253, 88 S W. 157, the court said:

"It seems clear to us that the mere fact that the prospective buyer, Jamison, said in the conversation at the wood pile, that he did not want defendant's farm without that of his brother, and that defendant replied to him that 'this ends the matter, then, between you and me,' cannot operate to terminate the agency, * * * though it was said in their presence and they heard it, as such remark was evidently only a part of the negotiations. It is an everyday occurrence with the prospective buyer, when he fully intends to buy, to say that the article does not suit him, that he don't believe he wants it; * * * and such statements cannot be treated, in cases of this kind, as terminating all negotiations. There was nothing said by the respondent to the appellant which tended to terminate their agency, if they had one."

The statement of appellant, as testified to by Mr. Harston, that "those people haven't got any money; I don't think there is a sale," in our opinion has no significance, other than the expression of discouragement in the midst of negotiations, characterized, as is usual in such cases, by alternating currents. The statement in no way delayed, hampered, or interfered with the deal. It came at a time when, under the undisputed facts, appellant had done all he could do or was required to do to entitle him to compensation; that is to say, after he had produced Mr. Callahan, the purchaser, with whom appellees negotiated in their own way and finally consummated a sale of the land on terms, conditions, and arrangements satisfactory to them. Neither appellant nor Harston said the agency was at an end, nor does the language used by appellant justify that construction.

[5] Harston and Brotherton testified in regard to the agreement with appellant to pay a commission, if the land was sold at $200 per acre, but both insisted on the trial that no agreement existed to pay a commission on the "corporation deal." Mr. Harston said: "I never made any kind of an agreement to pay any kind of a commission on the corporation deal."

It is undisputed that Callahan, with whom appellees consummated the deal, was produced by appellant as a prospective purchaser, and that the organization of the Harston Sand & Gravel Company resulted from negotiations between Callahan and appellees. This is conclusively shown by the testimony of Mr. Harston, who testified as follows:

"Q. Now, at the time Mr. Cranke told you he didn't believe these parties had any money, what did you say to Mr. Cranke, or whether or not that ended your relations with Cranke? A. The way I understood it, that ended my relations with him; then Mr. Callahan and I began to form a company, to organize a gravel company. * * * After I made that trade with Mr. Cranke he came with Mr. Callahan down to my office, and we went out to the land to show Mr. Callahan the land; after Mr. Cranke brought Mr. Callahan to my office we went out and looked at the land; I think it was the same day; I am sure; Mr. Callahan had never seen the land before, to my knowledge; the matter of a trade was not discussed with Mr. Callahan

that day; I left it to Mr. Cranke about pricing the land to Mr. Callahan and trying to sell it to him. Myself and associates afterwards sold the land to a company or association in which Mr. Callahan was a stockholder; that company was formed by Mr. Callahan and others. * * * It was some time about October that Mr. Cranke and I had the trade whereby he was to sell the land for $200 an acre; I think it was right along about the first of the year 1923, probably in December, 1922, that we consummated the sale to the Harston Sand & Gravel Company. * * * The negotiations that finally resulted in the formation of the company and the sale of the land were had after Mr. Cranke had brought Mr. Callahan to my office and after Mr. Cranke and I had shown Mr. Callahan the land."

In our opinion the conclusion from the undisputed evidence is irresistible that appellant, in pursuance of his contract of employment, produced Callahan, introduced him to Harston, set on foot negotiations, in the midst of which Harston and his associates, availing themselves of his services, took the matter into their own hands, changed terms, and abated the price limited to appellant, and finally consummated a sale and conveyed the land to a corporation formed by Callahan and his associates for that purpose.

Appellees should not be permitted to avail themselves of the services of appellant by consummating a sale on terms entirely satisfactory to themselves with the purchaser introduced to them by appellant and then refuse to pay, on the ground that there was no specific agreement to pay a commission on the sale as actually made. Such contention could be made in almost every instance where a satisfactory sale is finally consummated by the owner on terms different from those limited to the broker. If such a turn of affairs were permitted, the business of the land agent would rest upon such an insecure foundation as not to be worth following for a livelihood. The language of the court in Chilton & Cole v. Butler, 1 E. D. Smith (N. Y.) 150, quoted with approval by our Supreme Court in Hancock v. Stacy, 103 Tex. 219, 125 S. W. 884, is relevant at this juncture. The court said:

"If vendors were permitted to employ brokers to look up purchasers and call the attention of buyers to the property which they desire to sell, limiting them as to terms of sale, and then, while such purchasers were negotiating, take the matter into their own hands, avail themselves of the labor, services, and expenses of the broker in bringing the property into market, and accomplish a sale by an abatement in the price, and yet refuse to pay the broker anything, the business of a broker would not be worth pursuing; gross injustice would be done; every unfair and illiberal vendor would limit his property at a price slightly above the market and make use of the broker to bring it into notice, and then make his own terms with the buyers, who were in reality procured by the efforts of the agent."

The doctrine announced in this case is unquestionably the law and is conclusive against the contention of the appellees. It is the opinion of the majority of the court that the evidence admits of but one conclusion, to wit, that appellant made out his case and is entitled to recover.

[6] The judgment below will be reversed and rendered in favor of appellant against appellees for the sum of $1,625, with 6 per cent. interest per annum from the 6th day of February, 1923, being 5 per cent. of $10,000, the cash consideration, and the debt assumed for $22,500. The writer is of the opinion that appellant is also entitled to recover the further sum of $2,250, being 5 per cent. of $45,000 stock in the Harston Sand & Gravel Company received by appellees as a part of the consideration for the land, but, as Mr. VAUGHAN, Associate Justice, does not assent to this view, the contention is waived by me, and the judgment as rendered agreed to; but in a separate paper my views on this point will be stated.

As the evidence does not, in our opinion, justify a judgment against the Trinity Gravel Company, the case as to it will be affirmed.

Affirmed as to the Trinity Gravel Company, and reversed and rendered as to the other appellees.

LOONEY, J. (dissenting in part). The majority of the court, having concluded that the facts established liability on part of appellees, reversed the judgment of the trial court and rendered judgment in favor of appellant for $1,625. This allowed 5 per cent. commission on the cash consideration of $10,000 and on $22,500 indebtedness assumed. In addition to this, I am of the opinion that appellant should have recovered commissions on the amount of the corporation stock received by appellees as part consideration for the land. On this point, however, Mr. VAUGHAN, Associate Justice, and I do not agree; but we do agree on the judgment rendered.

I will state my reasons for the opinion that appellant should have been permitted to recover commissions on the amount of the corporation stock:

The Harston Sand & Gravel Company, the corporation, was organized by Mr. Callahan, and resulted from negotiations between Callahan and appellees that were set on foot after appellant had produced Callahan, the purchaser, and had earned his right to a commission.

The organization of the company was a means to the end desired by the parties, and was a proximate result of services performed by appellant. It cannot, in my opinion, be successfully contended that the conveyance of the land to the company under the circumstances was simply a change in the

evidence of ownership of the land existing in individuals to that of stock ownership in the corporation. The circumstances forbid this idea. Appellees received a cash consideration of $10,000. The company was chartered with an authorized capital stock of $120,000, being $75,000 in excess of the amount of the stock received by appellees; the excess being subscribed by others. Therefore it cannot be said that the corporation was formed by or for the use or convenience of appellees. This body of land owned and managed by the corporation as an active business is a materially different and more attractive proposition than it was in its inactive, undeveloped state prior to the change in ownership.

This added value to the holdings of appellees resulted proximately from the services of appellant.

In the case of Fouke v. Jordy (C. C. A.) 289 F. 220, the facts were almost identical with the facts of this case. The broker produced purchasers, to whom the owners, after negotiations, sold their properties in consideration of cash, $125,000, indebtedness assumed, $227,000, and $200,000 of the capital stock of a corporation organized to take over and handle the properties. It will be observed that the different elements that entered into the consideration for the sale of the property in that case, to wit, cash, the assumption of indebtedness, and stock in a newly formed corporation, are all present in the case under consideration. Plaintiff sued defendants for his commission based on the entire consideration—cash, indebtedness assumed, and the amount of corporation stock. At the trial it appeared that the owners had guaranteed any shortage of timber that might be ascertained at $5 per thousand feet. This shortage was ascertained to be $85,000. It also appeared that the owners had used of the stock in the corporation received by them as part consideration the sum of $86,000 in payment of various creditors.

The trial court permitted the broker to recover commission on the amount of cash paid and indebtedness assumed, but instructed the jury that he could not recover a commission on the corporation stock received. Verdict and judgment followed accordingly. The defendants contended on appeal that the judgment was excessive, in that they were compelled to pay a commission on the amount they had to make good on the guaranty, to wit, $85,000, which they claimed should have been deducted from the purchase price before the percentage of commission was calculated. The Circuit Court of Appeals denied this contention, saying:

"But the defendants are not in a position to claim a deduction on account of their guaranty, because they received as a part of the purchase price, upon which they were not required to account to the plaintiff for a commission,

one-third of the capital stock of the new corporation, out of which they have assigned in payment of their debts stock of the par value of $86,000. It thus appears that the defendants paid debts greater in amount than their estimated liability upon their guaranty, unless the stock was accepted by their creditors at less than par, as to which the evidence is silent."

This holding of the court was evidently based on the idea that, by reason of the erroneous instruction of the trial court, defendants escaped the payment of a commission on the corporation stock, and, as defendants had used a part of this stock to pay debts amounting to $86,000, they were in no position to claim a deduction in the amount of the commission on the $85,000 paid on the guaranty, because under no other process of reasoning could the judgment have escaped being held excessive. In this indirect way the court indorsed the idea that the plaintiff was entitled to a commission on the amount of corporation stock received by the owners of the property as a part of the consideration paid them on the sale.

The court further held in that case that the conveyance by the owners of the properties to the newly formed corporation, organized for the purpose of taking title to and operating the same, just as was accomplished in the instant case, constituted a sale within the meaning of the broker's contract of agency. The court said:

"We are of opinion that the transactions between the defendants and the parties produced to him by the plaintiff constituted a sale. The title was conveyed to a corporation organized and financed by the parties whom the plaintiff interested as prospective purchasers."

Applying this rule to the facts under consideration, I am of the opinion that the transactions involved in the instant case constituted a sale of the land; hence it follows that appellant, having performed the contract, is entitled to commissions contracted for, that is, on the entire consideration received by appellees for the land, and not simply on a part of the consideration. To resolve the matter otherwise places the court in the attitude of introducing into the contract of agency a limitation not placed therein by the parties.

For these reasons I am of the opinion that the judgment rendered for appellant should have included the additional sum of $2,250, being 5 per cent. commission on $45,000, the amount of capital stock of the Harston Sand & Gravel Company paid to appellees as a part of the purchase price for the land.

JONES, C. J. (dissenting). Unable to concur in the disposition of this case by the majority of the court, it has become necessary to file this dissenting opinion. The case was tried below before the court without the intervention of a jury, and the appeal comes

to this court on the statement of facts without any specific findings of fact by the trial court.

The grounds for this dissent are (1) that, under the settled rule of law governing this court, it is without power to enter judgment rendering this case in favor of appellant; (2) as there is evidence to sustain the judgment of the trial court, this case should be affirmed, as this court must presume that every issue of fact sustained by evidence was found by the trial court favorable to the judgment entered. Dallas v. Emerson (Tex. Civ. App.) 36 S. W. 304; Grace v. Miller, 4 Tex. Civ. App. 50, 23 S. W. 444; Dunn v. Price, 87 Tex. 318, 28 S. W. 681; Herndon v. Williams (Tex. Civ. App.) 233 S. W. 544.

The trial court is the forum where the issues of fact are determined. The Court of Civil Appeals may set aside the findings of fact either of a jury or of a court, but cannot substitute its findings of fact for those either of the jury or the trial court, if such findings in the court below have any evidence to sustain them. This rule of law is so clearly announced in the case of Post v. State of Texas, 106 Tex. 500, 171 S. W. 707, that we quote its language:

"The province of determining questions of fact is in the trial court. The Court of Civil Appeals has the power to set aside its finding and remand the cause for a new trial. Where the evidence is without conflict, it may render judgment. But, where there is any conflict in the evidence upon a material issue, it has no authority to substitute its findings of fact for those of the trial court."

In the case of Choate v. S. A. & P. Ry. Co., 91 Tex. 406, 44 S. W. 69, this rule of law is declared as follows:

"It is the province of the jury to determine questions of fact; but it is in the power of the trial judge to set aside the finding and to award a new trial. The Court of Civil Appeals has the same power upon appeal. But clearly the trial court cannot set aside the verdict of the jury and substitute its finding instead of the finding of a jury and render judgment accordingly. To say that the Court of Civil Appeals may do so when there is any conflict in the evidence is to concede to that court a power over the facts greater than possessed by the judge who heard the evidence, who had the witnesses before him, and had the opportunity of judging of their credibility by their appearance and manner of testifying."

A finding of fact by the trial court is governed by the same rule of law when it comes to this court, as is a finding of fact by a jury.

The power of this court to reverse the judgment of the trial court on its findings of fact and render a judgment opposed to such findings rests solely on the question, "Is there any evidence to sustain the judgment of the trial court?" It must then first be determined what is the undisputed evidence in this case. It is submitted that it consists only of the following facts: Harston, for himself and the other appellees, made an agreement with appellant that, if he would sell for $200 per acre the 471 acres of land owned by them, he would be paid the usual commission for such services; that appellant at once interested a Mr. Chamblin, a gravel expert, to assist him to make a sale, first, under the promise to pay him $800 of the commission, and later, to pay him in lieu thereof one-third of the amount recovered in this case; that appellant Chamblin and Harston inspected the land to determine its value as to gravel deposits, with the result that Chamblin was favorably impressed with the land in this respect; that after this visit to the land appellant interested a Mr. Callahan as a prospective purchaser under the terms named; that the parties who first inspected the land, together with Callahan and his gravel expert, at once inspected the land and Callahan secured permission from Harston for his gravel expert to make borings and other investigations of the land to determine its probable amount of gravel deposits; that Callahan did not become the purchaser of this land, either on the terms given appellant or on any other terms; that some two months or more after Callahan's visit to the land a corporation was formed, known as the Harston Sand & Gravel Company, in which corporation Callahan became a stockholder and an officer; that this corporation was formed through the joint efforts of Harston and Callahan, and for the purpose of taking over this land to exploit its gravel deposits; that the land was conveyed by appellees to this corporation for a consideration of $77,500, paid as follows: $5,000 in cash; one note for $5,000; the assumption of a prior indebtedness against the land in the sum of $22,500; and the issuance of stock to appellees of the par value of $45,000. The record does not state how much stock of the corporation was taken by Callahan; it does state that the corporation was organized with an authorized capital stock of $120,000, and names a number of parties who were interested as stockholders in the corporation, and leaves a clear inference that Callahan's stock holdings in the corporation were relatively small.

The evidence contained in the record, which is either in conflict with other testimony or which the law requires to be corroborated before it can be placed in the category of undisputed testimony, may be briefly stated as follows: (1) In behalf of appellant it was testified, in effect, by Chamblin and appellant, that on the occasion of the first visit to the land Chamblin suggested to Harston that the sale of the land called for more money than could likely be

controlled by a single person as a purchaser, and that he believed it was necessary for several persons to become interested in the purchase by means of the formation of a corporation or a partnership for the purpose of purchasing the land and exploiting it for gravel, and that Harston agreed that, if parties suitable to him were secured to form such a corporation or partnership, he would take stock in it as a part of his consideration and pay a commission in the event such a plan was consummated; that Callahan was interested through the efforts of appellant in such a plan for handling the land; and that his activities towards the formation of a corporation were the direct result of appellant's efforts. Appellant and Chamblin were the only witnesses called by appellant and, at the time they gave their testimony, each had a one-third interest in the amount of recovery, the other one-third being owned by a party who was not cognizant of any of the facts; (2) on behalf of appellee it was testified, in effect, by Harston that Callahan was shown the land only as a prospective purchaser of the land at $200 per acre; that some three weeks after Callahan's visit to the land, and while the said expert was completing his investigations as to the gravel deposits on the land, appellant came to his office and said, "Mr. Harston, those people [meaning Callahan and his associates] haven't got any money; I don't think there is a sale," to which Harston replied, "All right"; that he understood by this statement that appellant had ended his efforts to sell the land to Callahan; that about a month or six weeks after this interview with appellant he and Callahan began their efforts to organize the corporation for the purpose of taking over the land and marketing its gravel; that previous to his meeting with appellant he had had under consideration such a plan for handling the land, and had spoken to one Heiser, Callahan's business associate, in reference thereto; that as a result of his and Callahan's efforts the corporation was organized and the land purchased; that he never made any kind of an agreement to pay any kind of commission on the corporation deal, and never at any time acted for any of the other appellees as agent to deal with appellant to pay him a commission for aiding in the organization of the corporation known as the Harston Sand & Gravel Company; that, so far as he knew, appellant had nothing to do with interesting either himself or Callahan in the organization of the corporation. The only other witness in the case was appellee Brotherton, whose testimony is not deemed material.

The evidence offered by appellant could not be considered as making a prima facie case until there was evidence tending to show that his efforts were the procuring cause of the organization of the corporation for the purpose of selling the land, and that the land was sold as a result of the organization of this corporation. He does not make out such a case by the undisputed testimony; on the contrary, if he had rested his case on this undisputed testimony, to-wit, the fact that he was authorized to sell the land at $200 per acre, that for this purpose he had introduced Callahan to Harston and had assisted in showing him the land, and that afterwards a sale was made to a corporation of which Callahan was at most only a small stockholder, claim certainly could not be made that there was such a case in which the trial court would be authorized to instruct the jury peremptorily in his favor. Unless such a case was made by the undisputed evidence, this court cannot render a judgment in his favor. Appellant did not rest his case on the undisputed testimony, but offered evidence tending to show that he entered into another agreement with Harston, looking to the formation of such a corporation for the purchase of the land and his allowance of a commission should the land be sold to such corporation. Not only is this evidence, which was vital to appellant's right of recovery, disputed by Harston, but there is a rule of law which declares, in effect, that a plaintiff's right to recover in his suit cannot be assumed on his uncorroborated testimony, even if such testimony be uncontradicted. All of the testimony given in behalf of appellant in reference to the formation of a corporation and appellant's activities in respect thereto is given either by appellant or by Chamblin, both equally interested in the recovery, and wholly uncorroborated by any other evidence. This rule of law is announced by our Supreme Court in Dashiell v. Johnson, 99 Tex. 546, 91 S. W. 1085, in which the Court of Civil Appeals reversed a judgment of the lower court and rendered judgment in favor of a husband and wife because the judgment of the lower court was opposed by their testimony, which was undisputed. The Court of Civil Appeals was reversed and the rule laid down that the truthfulness of such testimony cannot be assumed by a court, but must be submitted to a jury in the trial court. To the same effect is Turner v. Grobe, 24 Tex. Civ. App. 554, 59 S. W. 583, and A. T. & S. F. Ry. Co. v. Lucas (Tex. Civ. App.) 148 S. W. 1149.

In this case, in rendering judgment in favor of appellant, the majority of this court must have assumed the truth of this uncorroborated testimony of the interested parties, not only against the rule above announced, but also against the evidence of Harston in conflict with such testimony. It appears to me that the evidence in this record so clearly raises an issue as to whether

appellant was the procuring cause of the formation of the corporation and the sale of the land to such corporation, that no further argument is needed to sustain this view.

It is also my view that, under the rule that usually obtains in review of judgments of this character by our appellate court, this case ought to be affirmed. The court below was warranted in finding that appellant abandoned his efforts to make a sale to Callahan. If it was abandoned by appellant, and at a later date Harston made a sale direct to appellant, no commission in favor of appellant would be incurred by reason of such sale. Land Mortgage Bank of Texas v. Hargis (Tex. Civ. App.) 70 S. W. 352; note in Ann. Cas. 1913E, 788. In this note the doctrine upon which the case of Land Mortgage Bank of Texas v. Hargis, supra, evidently is decided is announced in the following language:

"Although the broker may be the means of first bringing the parties together and of opening negotiations with them, yet if the negotiations are unproductive and the parties in good faith withdraw therefrom and abandon the proposed purchase and sale, a subsequent renewal of negotiations followed by a sale at a less price does not entitle the broker to the commissions, as he cannot be said to be the procuring cause of the sale."

This is supported by the citation of a number of authorities. In the case at bar, however, Callahan and his associates never became the purchasers. They only owned a minority of the stock in the corporation that did become the purchaser. The rule above announced applies with much greater reason to this case.

The conflict in the evidence as to whether appellant had anything to do with the formation of the corporation was an issue for the trial court to determine. In the instant case, this issue was determined against appellant on the conflicting testimony outlined above, and, by reason thereof, the duty rests on this court to affirm such judgment.

I respectfully dissent from the opinion of the majority of this court in reversing and rendering this cause.