### TRINITY GRAVEL CO. et al. v. CRANKE.
(No. 786–4446.)

(Commission of Appeals of Texas, Section A. April 28, 1926. On Motion for Rehearing, June 26, 1926.)

1. Brokers ⊚⇒53—Broker, employed to sell certain gravel land, who interested another in organizing company to purchase it, held entitled to commission on entire purchase price, when such company subsequently bought land.

Broker, employed to sell certain gravel land, who interested another in organizing company to purchase it, *held* entitled to commission on entire purchase price, when such company subsequently bought land, paying for it partly by issue of its stock, though he did not assist in working out corporate organization, since his diligence was primary and proximate cause of sale.

2. Brokers ⊚⇒57(2).

Subsequent variations from price originally named in broker's contract to sell gravel land *held* immaterial, where vendor accepted novated terms.

3. Brokers ⊚⇒45—Intent is necessary element of broker's "abandonment" of his agency.

Intent is necessary element of broker's abandonment of his agency; "abandonment" being purposed relinquishment of known right.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Abandon—Abandonment.]

4. Brokers ⊚⇒88(1)—Evidence held not to present issue of abandonment, mutual rescission, or permissible revocation of broker's agency.

Evidence *held* not to present issue of abandonment, mutual rescission, or permissible revocation of broker's agency, where he told principal that he did not think there was a sale, but subsequently continued to assert right to commission, and principal never told him that he considered negotiations off.

5. Evidence ⊚⇒594—Trier of facts cannot deny proper weight to undisputed testimony of interested party, where no suspicion is cast on it by other facts of case.

Trier of facts cannot deny proper weight to undisputed testimony of interested party,

where no suspicion is cast on it by other facts of case, and adverse party, with personal knowledge of facts, was warned of issue in pleading.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Action by J. P. Cranke against the Trinity Gravel Company and others. Judgment for defendants was reversed and rendered, except as to named defendant, but for an amount less than sued for, by the Court of Civil Appeals (272 S. W. 604), and defendants bring error. Reversed in part and rendered, and in part affirmed.

Rasbury, Adams & Harrell and Grover Adams, all of Dallas, for plaintiffs in error. W. B. Hamilton and Norman Hamilton, both of Dallas, A. W. Walker, Jr., of Austin, and William H. Crunk, of Commerce, for defendant in error.

NICKELS, J. J. P. Cranke sued Dan S. Harston and four other persons, who, it was alleged, composed a partnership, or unincorporated association, styled Trinity Gravel Company (the alleged association being made a party. defendant also), and sought judgment in the sum of $3,875, with interest, as his broker's commission of 5 per centum, earned in connection with the alleged sale of 471 acres of "gravel land" by defendants to the Harston Sand & Gravel Company, a corporation. The pleading and proof show that this corporation was promoted and organized late in 1922, or the first part of 1923, for the purpose of purchasing the land and producing and marketing gravel therefrom, and that its capital stock was $120,000, par value. The sale was made to the corporation, and, as the consideration, the defendants received $45,000, par, of the capital stock, $5,000 in cash, vendors' lien note for $5,000, and the corporation assumed payment of $22,500 indebtedness outstanding against the land. Trial was before the court, without a jury, and, as a result, judgment was rendered denying Cranke any relief. Upon appeal, the judgment (except as to "association") was reversed by the honorable Court of Civil Appeals for the Fifth District (272 S. W. 604), aand judgment was rendered against the individual defendants, and in Cranke's favor, for the sum of $1,625 (equal to 5 per centum of the aggregate consideration named less the amount, par value, of the corporate stock received by defendants), with interest. Chief Justice Jones dissented, and expressed the view that the judgment of the trial court ought to be affirmed. Associate Justice Looney agreed with Associate Justice Vaughan in rendition of judgment for the sum named, but filed a separate opinion, in which he stated the belief that the amount to which Cranke is entitled includes a commission of 5 per centum of the $45,000 of corporate stock also.

The primary question is whether, as a matter of law, the broker's commission has been earned. Upon this point we are in agreement with the conclusions expressed in the majority opinion of the Court of Civil Appeals. There is no dispute about these propositions: (a) Harston (acting for himself and the other part owners) employed Cranke to find a purchaser; the price originally named being $200 per acre. (b) Immediately thereafter Cranke employed Chamblin to assist him in finding the purchaser, and the two, in company with Harston, inspected the land, and Chamblin (a gravel expert) examined it professionally. (c) In immediate connection with that inspection trip Chamblin gave Harston his opinion of the possibilities of the land as a source of commercial gravel, and suggested that the best results could be obtained through the expenditure, by a purchaser, of a substantial sum (additional to the purchase price) in equipment, etc., and that, therefore, it would be difficult to find an individual in a position to furnish the amount of money required, and that, probably, a company would have to be organized to purchase. These suggestions were followed by the inquiry whether Harston would be willing to go into such a company and take stock in part payment for the land and still pay the broker's commission, and Harston replied that he would do so if suitable associates were found. (d) Prior to that time Chamblin had been associated with Callahan (an officer of Callahan Construction Company), and he and Cranke had Callahan in mind as a possible buyer, and immediately after the inspection mentioned Chamblin sent Cranke to Callahan. Cranke told Callahan of Chamblin's opinion of the gravel deposits, and Callahan requested Cranke to go with him (and his manager) to the land, and the trip was made. Immediately upon the return to Callahan's office he suggested to Cranke that they go and talk to Harston about the proposition and this was done. Cranke introduced Harston and Callahan, and the proposed sale and purchase was discussed between them at length. In the course of the interview Callahan asked Harston if he would be willing to go into a corporation to be organized as the purchaser and take stock for part of the purchase price, and Harston replied that he would be glad to do so with Callahan. The interview terminated with an agreement that Callahan should have his own gravel expert make thorough testings of the deposits as a preliminary to further negotiations. (e) The testings thus provided for required considerable time—some three weeks or more. The results were favorable. (f) About "three weeks, or, probably a month," after the original employment, Cranke appeared at Harston's office. In the course of conversation about the project, according to Harston's version, Cranke remarked that "those people

(meaning Callahan and his associates) haven't got any money—I don't think there is a sale," and Harston replied, "All right." According to Cranke's testimony, the remark was made by Harston, and to it he demurred. Harston testified that, as he "understood it, that ended any relation" with Cranke, and thereafter he did not consider him "as being in it at all." (g) After completion of the testings made by Callahan's "gravel expert," Callahan became active, and took "the lead" in efforts to form a corporation to purchase the land and to market gravel therefrom. In these efforts he was joined by Harston and others, and the result was the organization of the Harston Sand & Gravel Company, a corporation, and a conveyance of the land to it for the considerations already stated. (h) No further services from Cranke or Chamblin in respect to working out the corporate organization were requested by Harston et al. or Callahan, although they were available and ready for the purpose, if desired. (i) Shortly prior to the conveyance, Cranke interviewed Harston and insisted that he would be entitled to his commission. According to Cranke's testimony, Harston never at any time denied liability for a commission, but did claim that a commission was not earned on the amount of the consideration represented by the debt ($22,500) assumed by the corporation or the corporate stock ($45,000) received, or to be received. According to Harston's testimony, he denied liability for a commission in any amount, but, in order to avoid litigation, he offered to pay Cranke $500; i. e. 5 per centum of the $5,000 cash received and $5,000 to be received. (j) The aggregate consideration of the sale was $77,-500, as against $94,200 originally named as the price. The agreement of reduction was made in the course of negotiations between Callahan and Harston in relation to the corporate promotion.

[1, 2] In fact and in law Cranke's diligence, efforts, and expenditures set in motion the forces which achieved the organization and the sequent purchase. The line between cause and effect was not broken by the interposition of the corporate promotion and resultant entity. Those things, on the contrary, merely became mutually selected links in the chain contributing appropriate transmission media for the influences originally excited instead of diverting them to other and contrary goals. The essential proximity of causation exists, and in this respect the broker's efforts, in his favor, may be somewhat analogized to the defendant's conduct, as against him, in throwing the lighted squib into a crowd of men under the circumstances spoken of in Scott v. Shepherd, 2 W. Blackstone, 892 (Seale v. G., C. & S. F. Ry. Co., 65 Tex. 278, 57 Am. Rep. 602). The corporate promotion in the instant case was no more an independent intervening and causing agency than was the wrongful dealing

through a subsequent broker in Hancock v. Stacy, 125 S. W. 884, 103 Tex. 219. There can be no doubt that Cranke's diligence was the primary cause of the ultimate happening, and, in our opinion, it is equally certain that, in a legal sense, it was the proximate, and, therefore, the producing, cause of the sale. Page v. Sutton, 204 P. 881, 207 P. 1102, 45 Nev. 395; Fouke v. Jourdy (C. C. A.) 289 F. 220. Judge Jones' dissenting opinion embraces the postulate that the purchasing corporation was created "through the joint efforts of Harston and Callahan for the purpose of taking over the land," but a non sequitur exists in that the assumption made ignores the indisputable fact that Callahan's "efforts," whether joint or several, and the "joint efforts" of himself and Harston, were all produced by the services of Cranke and his associate Chamblin. And the fact that there were subsequent variations from the price originally named is rendered immaterial by the acceptance of the novated terms. Goodwin v. Gunter, 185 S. W. 295, 195 S. W. 848, 109 Tex. 56.

[3, 4] The evidence, in our opinion, does not present the issue of abandonment by Cranke or of mutual rescission by him and Harston or of permissible revocation of the agency by the latter. Abandonment is the purposed relinquishment of a known right. It rests upon intent, and, ordinarily, to be effective, the intent must be accomplished through acts effectually appropriate to the purpose. Sikes v. State (Tex. Cr. App.) 28 S. W. 688; Sideck v. Duran, 3 S. W. 294, 67 Tex. 256; Archibald v. Jacobs, 6 S. W. 178, 69 Tex. 248; Grubb v. McAfee, 212 S. W. 464, 109 Tex. 527; Hines v. Nelson (Tex. Civ. App.) 24 S. W. 541; Saxlehner v. Eisner & Mendelson Co., 21 S. Ct. 7, 179 U. S. 19, 31, 45 L. Ed. 60. When the defense is made, and in its support conduct is shown which (if unexplained) would be sufficient for its establishment, it may be answered by showing that there never was an intention to give up and relinquish the right. Id.; Singer Mfg. Co. v. June Mfg. Co., 16 S. Ct. 1002, 163 U. S. 169, 186, 41 L. Ed. 118; Moore v. Stevenson, 27 Conn. 14; Livermore v. White, 74 Me. 452, 43 Am. Rep. 600; Judson v. Malloy, 40 Cal. 299; Hickman v. Link, 22 S. W. 472, 116 Mo. 123. The conduct and declarations relied upon in this aspect of the case consist of Cranke's visit to Harston "about three weeks" or "a month" after the original employment and the declaration then made to the effect that Callahan and associates "haven't got any money," and that he did not think "there is a sale," plus Harston's reply, "All right." This is Harston's version of the incident, and, while it is directly contradicted by Cranke, we take it as true. So taken, in form and import, the thing amounts to no more than a somewhat pessimistic expression of opinion about a future eventuality. Even as a guess it was bad, for the doubted

thing came to pass. In order to convert it into an expression, or implication, of a purpose to relinquish a right something must be added, and that addition must be in discord with what was actually said and done, and not in harmony with it. Moreover, the addition must be made against the direct testimony of Cranke that no such conversation as that described by Harston took place. All of the reasons which, in proper instances, allow courts (by way of implication) to add something to, or to subtract something from, what was actually said or done negative the authority here. And, too, the intent to abandon is clearly disproved by the undisputed testimony of subsequent conduct and declarations. That Cranke (on each appropriate occasion) continued to assert his right to the commission is not challenged, and this (in the absence of proof of inconsistent acts) would answer the defense of abandonment, as, also; the idea of mutual rescission. Harston says that, after the incident described, "as he understood it," "any relation with him" was "ended"; that he (Harston) "considered it off"; and that he "didn't even consider him as being in it at all," but that he "never told Mr. Cranke that the negotiations were off." Naturally, these ex parte ideas (involving opinions of law as well as of fact, it will be noted) could not bind, or otherwise affect, Cranke, or declare a revocation of the agency.

[5] The insistence is made, however, that the fact of Cranke's and Chamblin's interest in the result of the litigation raised an issue about their credibility, with the consequence that the trial court had the right to disregard the parts of their testimony which were not contradicted, and in which alone some of the material facts have support. In favor of the judgment, it is said, a presumption of such a disregard exists. But that legislative action which removed the ancient common-law disqualification was tantamount to a declaration that testimony is not shorn of all probative force merely because of the fact of interest. The incongruity of making competent evidence that which a trier of fact issues may arbitrarily disregard is manifest. The present case may be used as an illustration to give point to the incongruity, for none but interested parties testified on either side, and, if the rule were such as that claimed, the judge (in such a case tried with a jury) could not set the verdict aside, nor could it be reviewed on appeal. But here, as elsewhere, the rule is that the judge (acting without a jury), or a jury, may not "lawfully deny proper weight to undisputed facts with no suspicion cast upon them." Grand Fraternity v. Melton, 117 S. W. 788, 102 Tex. 399; Beene v. Rotan Grocery Co., 110 S. W. 162, 165, 50 Tex. Civ. App. 448; Malone v. Nat. Bank (Tex. Civ. App.) 162 S. W. 369. It is true that there may be found in the books statements to the effect that, ab-

sent corroboration, undisputed testimony of parties litigant may be given that disposition; but a statement of that import, wherever found, must be read with the context and the record to which it is directed, and, when that is done, it will be found (in most instances, at least) the court had in mind a situation where circumstances afforded an indirect contradiction, and the term "undisputed," as used, signified that there was no conflict directly raised by opposing affirmative testimony. An example of this limitation upon the supposed rule may be found in Dashiell v. Johnson, 91 S. W. 1085, 99 Tex. 546 (cited in the opinion of dissent), wherein it was held that, in view of "all the circumstances" disclosed by the record, an issue of credibility existed, although the "interested" testimony was not "directly contradicted." Another and like example may be found in Coats v. Elliott, 23 Tex. 613, usually cited as authority for the right to disregard testimony of interested witnesses. In the present case, the testimony is not inherently unreasonable as to import; contrarily, its subject-matter is in line with the actions of ordinary men. It is not inconsistent with the meaning of any other circumstance exhibited by the record. And, in truth, it has a large measure of circumstantial corroboration. Harston had personal knowledge of the facts, whatever they are. Cranke and Chamblin preceded him upon the stand. Cranke's pleading had warned him of the issue and what would be offered in its support; Harston had full opportunity (under conditions implying a duty) to deny the truth of the other testimony, if that testimony was false; but he denied only as to immaterial things, and his silence in respect to the others is not without a meaning which is probatively forceful and corroborative in nature. Beene v. Rotan Grocery Co., supra. The other individual defendants, presumptively, had a like warning, had a personal knowledge of some of the facts, and to that extent a like opportunity to deny, but they emulated Harston's example and remained silent. And, too, there is the unexplained absence of Callahan, the business associate of Harston, with a personal knowledge of most of the important facts. In our opinion, there is no warrant for a holding that the undisputed testimony of Cranke and Chamblin may be denied weight, and, when given its lawful effect, it determines all of the questions involved against Harston and the others for whom he acted in the employment of Cranke.

As to the matter of the inclusion of the $45,000 corporate stock in the aggregate amount upon which the 5 per cent. commission is based, we are in accord with the views expressed in Associate Justice Looney's partial dissent.

Accordingly, we recommend that the judgments of the district court and of the Court of Civil Appeals be reversed as between J. P.

Cranke on the one hand, and Dan S. Harston, D. G. Smith, L. S. Brotherton, C. B. Van Deman, and M. F. Smith upon the other, and that judgment be here rendered in favor of Cranke and against the other parties just named in the sum of $3,875, with interest at the rate of 6 per centum per annum from February 6, 1923, and that the judgments, in so far as they deny to Cranke relief against the Trinity Gravel Company, be affirmed.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reversed as between Cranke on the one hand and Harston, D. G. Smith, Brotherton, Van Deman, and M. F. Smith on the other, and judgment rendered for Cranke against said other named parties for $3,875, with interest as recommended by the Commission of Appeals. Said judgments are otherwise affirmed.

## On Motion for Rehearing.

NICKELS, J. We have carefully examined the motion for rehearing filed by plaintiffs in error and find that it presents no error in the disposition of the case.

The motion, however, calls attention to an expression in the opinion which may be somewhat ambiguous; plaintiffs in error construing it to mean that we indicated that none of them, except Mr. Harston, testified, whereas Mr. Brotherton took the witness stand. The idea we intended to convey was that neither Mr. Harston nor any of the others of the plaintiffs in error testified in denial of certain material facts disclosed in the previous testimony of Mr. Cranke and Mr. Chamblin.

It .is insisted that some general denials made by Mr. Harston are sufficient to raise a question of fact which, primarily, was to be determined by the trial judge. But, in view of material facts which were proved without dispute otherwise, the general expressions used by Mr. Harston were merely expressive of his views of applicable law; and in those views, we held, he was mistaken.

We recommend that the motion for rehearing be overruled.