**Wallace GROVES et al., Appellants,**

v.

**Virginia HANKS, Appellee.**

**No. 1086.**

Court of Civil Appeals of Texas, Corpus Christi.

Dec. 30, 1976.

Rehearing Denied Jan. 26, 1977.

Ralph Alexander, Kelley, Looney & Alexander, E. G. Henrichson, Henrichson & Smith, Edinburg, for appellants.

William E. York, McAllen, for appellee.

## OPINION

BISSETT, Justice.

This is a suit to recover damages for an alleged breach of contract between Bryan Hanks and Wallace Groves, and to recover the proceeds of certain checks which were made payable to Bryan Hanks and were allegedly converted by Wallace Groves, his employees, and the defendant banks when the monies represented by the checks were deposited to Wallace Groves' accounts in the banks.

Bryan Hanks, (Hanks) died on December 18, 1972. This suit was instituted on August 30, 1973 by Virginia Margaret Wooding Hanks, (Mrs. Hanks), the widow of Hanks, who sued individually and as independent executrix of the Estate of Bryan Hanks, Deceased. The defendants are: Wallace Groves, (Groves), William Gaudet, (Gaudet), L. C. Hill, (Mrs. Hill), the First National Bank of Edinburg, Texas, (Edinburg Bank), and the First National Bank of Mission, Texas, (Mission Bank). In addition to defensive pleadings filed by all of the defendants, Groves filed a cross action against Mrs. Hanks to recover certain monies which she withdrew from a bank account standing in the name of "Bryan Hanks, Agent", which allegedly was owned by Groves.

Following a trial to the court, no jury having been demanded or empanelled, judgment was rendered in favor of Mrs. Hanks on both actions brought by her, and all relief sought by Groves on his cross action was denied. In particular, the judgment awarded Mrs. Hanks: 1) all of the money, ($72,325.29) previously escrowed with the Continental National Bank of Fort Worth and paid into the registry of the United States District Court for the Northern District of Texas, Forth Worth Division, pending the outcome of this suit, together with interest thereon; further awarded Mrs. Hanks $39,372.15, together with interest thereon from August 15, 1972 until September 29, 1975 at the rate of 6% per annum, against Groves, Gaudet, Mrs. Hill and the Edinburg Bank; and further awarded Mrs. Hanks $68,052.86, together with interest thereon from August 16, 1971 until September 29, 1975 at the rate of 6% per annum, against Groves, Gaudet, Mrs. Hill and the Mission Bank. The judgment further provided that the various sums of money awarded Mrs. Hanks would bear interest at the rate of 9% per annum from and after September 29, 1975 until paid, and that the Edinburg Bank have judgment over and against Groves, Gaudet and Mrs. Hill for the said sum of $39,372.15, together with interest thereon, and that the Mission Bank have judgment over and against Groves,

Gaudet and Mrs. Hill for the said sum of $68,052.86, together with interest thereon. All of the defendants have appealed from the judgment in favor of Mrs. Hanks, but the defendants Groves, Gaudet and Mrs. Hill have not appealed from the portions of the judgment which awarded judgment in favor of the banks over and against them.

■ Findings of fact and conclusions of law were filed by the trial judge. The findings have not been attacked in this appeal by specific points of error. At the end of the statement and argument made by Groves under point four (his last point) in his original brief and immediately preceding the prayer appears the following paragraph:

"To the extent that the Findings and Conclusions of the Court may conflict with the above, which are based upon stipulations and undisputed evidence, such Findings and Conclusions should be disregarded."

The above-quoted portion of Groves' brief is nothing more than a mere blanket assertion that at least some of the findings are contrary to the evidence, does not point out in what respect the findings conflict with Groves' asserted points of error, and does not state in what respect each particular finding is not supported by the undisputed evidence. The paragraph is a mere abstraction that does not point out anything tangible or definite. It is too general to be considered as a sufficient challenge to any particular finding of fact. See *Hardeman v. Timmins*, 111 S.W.2d 746 (Tex.Civ.App.— El Paso 1937, writ dism'd); *Southern Pine Lumber Co. v. Nemer*, 17 S.W.2d 852 (Tex. Civ.App.—Galveston 1929, no writ); *Danciger v. Wood*, 240 S.W. 694 (Tex.Civ.App.— Amarillo 1922, no writ).

Mrs. Hanks, as plaintiff, admitted in her pleadings that her husband and Groves, prior to May 6, 1946, entered into "a business arrangement . . . to be carried entirely under the name of Bryan Hanks", and that Groves "paid the purchase price and operating expenses of the properties purchased, including any losses"; that "Hanks was to devote his time to the man-agement of the properties, and was to own a 10% interest in and to receive 10% of any net profits on the sale of any of said properties plus a salary of $36,000.00 per year". She alleged that Groves owed Hanks "well over $400,000.00". The agreement dated May 13, 1971, by and between Hanks and Groves, hereinafter discussed in detail, which terminated the business relationship between Hanks and Groves, was made a part of her petition; she alleged that Hanks complied with all terms and conditions imposed upon him by the termination agreement; that Groves, with the exception of the payment of $400,000.00 to Hanks, breached the agreement; and that as a result thereof, she was entitled to 10% of the net profits accruing to Groves from the sale of certain properties which were sold by Groves after May 13, 1971.

Mrs. Hanks also sought to recover the proceeds of certain checks which were made payable to Bryan Hanks, and which were deposited by Mrs. Hill, the employee of Groves, to the account of Groves in the defendant banks. She alleged that while Hanks was managing the properties Mrs. Hill was the office manager for the business and that she was given "a power of attorney in connection therewith"; that the power of attorney was cancelled by the termination agreement; that Mrs. Hill, from and after May 13, 1971, "was the employee solely of Wallace Groves"; that she endorsed the name of Bryan Hanks to the checks and deposited them in Groves' bank accounts, entitled "Monte Christo Ranch", in the defendant banks without the authority of Hanks; and that such action by Mrs. Hill amounted to a conversion of the checks to her damage in at least the sum of $107,425.01.

■ Certain evidentiary facts were conceded by a written stipulation of the parties. The other facts which were proven were established by undisputed evidence. In that state of the record, it was the duty of the trial judge, in this a non-jury trial, to determine the legal effect of the stipulated facts and the undisputed evidence and to correctly apply the law to the conceded or

undisputed facts. *Southland Life Ins. Co. v. Egan*, 126 Tex. 160, 86 S.W.2d 722 (Tex. Com.App., 1935); *Employers Casualty Company v. American Employers Insurance Company*, 397 S.W.2d 292 (Tex.Civ.App.— Amarillo 1965, writ ref'd, n. r. e.). See also *Dallas General Drivers, Warehousemen And Helpers v. Wamix, Inc., of Dallas*, 156 Tex. 408, 295 S.W.2d 873, 879 (1956).

Sometime prior to May 6, 1946, Hanks and Groves entered into a contract whereby Hanks agreed to act as agent and attorney in fact for Groves in the acquisition, operation and sale of certain properties. Thereafter, properties were purchased and operated pursuant to the contract, including certain lands in Hidalgo County, Texas, designated by the parties as the "Valley Lands", and certain lands in the City of Fort Worth, Texas, designated by them as the "Summit Avenue Property".

The business arrangement between Hanks and Groves was terminated by an instrument in writing which was dated May 13, 1971. The instrument was introduced into evidence without objection. It was agreed:

(1) Hanks, would execute and deliver to Groves deeds and assignments covering all property standing in his name pursuant to the contract and powers of attorney theretofore existing;

(2) Hanks would cancel the existing powers of attorney when he completed the transactions required by the termination agreement;

(3) Hanks would execute "any and all other instruments necessary to effectuate the sense of these agreements";

(4) Groves would pay Hanks the sum of $400,000.00 in full settlement of unpaid salary due Hanks;

(5) Groves would pay Hanks 10% of all profits resulting from the sale of any property in Texas standing in the name of Hanks or jointly in the names of Hanks and Groves, which might be received by Groves from any party with whom Hanks was then negotiating for either a sale or lease.

Hanks conveyed the Hidalgo "Valley Lands" and the "Summit Avenue Property" to Groves on June 2, 1971. Groves then entered into exclusive possession of the "Valley Lands", and thereafter operated the same through his agent Gaudet, a defendant herein, under the name of "Monte Christo Ranch". Hanks did not formally cancel any of the then existing powers of attorney. Groves paid $400,000.00 to Hanks.

## THE SUIT FOR BREACH OF CONTRACT

■ The action for damages because of breach of contract is based on a refusal by Groves to pay Hanks or Mrs. Hanks 10% of the profits from the sale of the "Summit Avenue Property", which amounted to $72,325.29. It was stipulated: 1) Hanks, prior to May 13, 1971, contacted the real estate firm of Ferree & Searcy concerning the sale of certain portions of the "Summit Avenue Property", and also contacted the real estate firm of Yager & Co. concerning the sale of all of it; 2) In February, 1972, Groves listed the property for sale with Ferree & Searcy, Realtors; 3) because of confusion created by this listing, Ferree & Searcy stopped offering the property at $800,000.00; 4) thereafter, Edward Yager, the President of Yager & Co., contacted a Fort Worth Insurance Company President who referred him to another brokerage house which, in turn, referred him and his associate, Albert Komatsu, to its associate, Century Development Corporation (CDC), who entered into an Option Agreement with Groves on July 31, 1972 to purchase the property for $880,000.00; 5) CDC, however, decided not to go through with the purchase of the property; 6) Harry D. Lane, who had been an agent of CDC, terminated his relationship with CDC, and acquired an assignment of the option from it; 7) Yager, Komatsu and Lane, then, as incorporators, formed Summit Office Park, Inc., the stock of which was owned ⅓ by each of them; 8) Groves conveyed the "Summit Avenue Property" to Summit Office Park, Inc., by Deed dated March 18, 1973; 9) an escrow agreement was executed on Febru-

ary 21, 1973, by Groves, Mrs. Hanks and the Continental National Bank of Fort Worth; 10) a correct copy of the escrow agreement, marked Exhibit 8, was attached to the stipulation.

The copy of aforesaid escrow agreement was introduced in evidence. It provided that a sum of money "equal to ten per cent of the net profits resulting from the sale of any or all of the property" would be deposited in the Continental National Bank of Fort Worth, "to be held by it as Escrow Agent pursuant to the terms of this Agreement".

The trial court found:

". . . Following the escrow agreement, Stipulation Exhibit 8, ten per cent of the net profits from the sale, $72,325.29, was escrowed with Continental National Bank of Fort Worth . . . Subsequently, this amount, with accrued interest, was paid by that Bank into the registry of the United States District Court for the Northern District of Texas, Fort Worth Division . . . ."

\*     \*     \*     \*     \*     \*

"The sale was a sale to 'parties and their assigns' with whom HANKS was negotiating directly or through agents under the terms of the dissolution agreement of May 13, 1971, since HANKS was the direct procuring cause, . . . of the subsequent sale . . . ."

Groves' third point of error reads, as follows:

"The trial court erred in holding that under the dissolution contract between BRYAN HANKS and WALLACE GROVES, appellee was entitled to recover a percentage or commission out of the net proceeds from the sale of the Summit Avenue Property in Forth Worth here in question, because such holding is contrary to the undisputed evidence and stipulations."

The point cannot be sustained. There is no finding or conclusion that Mrs. Hanks was entitled to a "percentage or commission out of *net proceeds* from the sale of the Summit Avenue Property", as asserted in

the point. A "commission" of 10% out of the "net proceeds" of the sale is different from 10% of the "net profits" of the sale. The findings by the trial court are amply supported by the stipulation, Exhibit 8 thereto, coupled with the depositions of Yager and Komatsu, both of which were introduced into evidence without objection.

It is conclusively established by the record that Hanks, prior to May 13, 1971, set in motion the forces which ultimately brought about the sale of the "Summit Avenue Property" to Summit Office Park, Inc. The line between cause and effect was not broken by the interposition of Summit Office Park, Inc., into the picture. The causal chain is unbroken and runs directly from Hanks to Summit Office Park, Inc. There is no question but that Mrs. Hanks, under the terms of the termination agreement, is entitled to 10% of *net profits* realized in the sale of the "Summit Avenue Property". *Trinity Gravel Co. v. Cranke*, 282 S.W. 798 (Tex.Com.App., 1926); *Finlay-Tampico Oil Co. v. Robbins*, 246 S.W. 1047 (Tex.Civ.App. —El Paso 1923, no writ); *Wright v. Griffith & Griffith*, 227 S.W. 1115, 1116 (Tex.Civ. App.—Texarkana 1921, writ dism'd). The net profit was found to be $72,325.29. That finding was not attacked by a point of error. Groves' third point is overruled.

## THE SUIT FOR CONVERSION

With respect to the suit for the conversion of checks, Mrs. Hanks, in her trial petition, alleged, in substance: 1) during the time that Hanks managed the properties for Groves he gave Mrs. Hill a power of attorney, but that the same was cancelled by the termination agreement of May 13, 1971; 2) that Mrs. Hill, the employee of Groves, without the authority of Hanks, endorsed the name of "Bryan Hanks" to certain checks that were made payable to him, and deposited the same to Groves' accounts in the defendant banks; 3) the total amount of money represented by the checks was $107,425.01; 4) the unlawful and unauthorized endorsement of the checks constituted conversion, to her damage in the sum of $107,425.01.

Groves, in addition to pleading the two-year statute of limitation, filed a general denial, and specially pled that "Hanks was never entitled to any of the money represented by such checks".

The following facts were established by either stipulation or by undisputed evidence, to-wit:

(1) On February 26, 1964, in the furtherance of the business enterprise of Hanks and Groves, Hanks signed a "United States Department of Agriculture, Agricultural Stabilization and Conservation Service (ASCS) Power of Attorney" to Mrs. Hill, who, for the years 1971 and 1972, pursuant to said power of attorney, made application to the ASCS for participation of the "Valley Lands" in the Upland Cotton Set Aside Program;

(2) Money was paid to the participants in the above-mentioned program in accordance with certain allotment formulas;

(3) The power of attorney made in Mrs. Hill's favor was never revoked by Hanks during his lifetime;

(4) The hereinafter-mentioned checks which were issued by the United States Commodity Credit Corporation (USCCC) for the years 1971 and 1972 were issued pursuant to applications that were signed by Mrs. Hill;

(5) The power of attorney to Mrs. Hill was effectively cancelled by the power of attorney executed by Groves on September 29, 1972 and filed with the ASCS on October 6, 1972, wherein Gaudet was appointed agent for Groves;

(6) Following the execution of a deed by Hanks to Groves on June 2, 1971, Groves then entered into the exclusive possession of the "Valley Lands", and thereafter operated the same through his agent Gaudet, under the name of "Monte Christo Ranch";

(7) The USCCC issued a check payable to the order of Bryan Hanks in the sum of $39,123.24 for participation in the Upland Cotton Set Aside Program for the year 1971; the check was endorsed "Bryan Hanks" by Mrs. Hill and was deposited in Groves' "Monte Christo Ranch" account in the Mission Bank on August 16, 1971;

(8) The USCCC 1972 payment for participation of the same properties in the Upland Cotton Set Aside Program was made by check, dated August 3, 1972, in the amount of $36,921.02, payable to the order of "Bryan Hanks", which was also endorsed "Bryan Hanks" by Mrs. Hill and was deposited by her in Groves' "Monte Christo Ranch" bank account in Edinburg Bank on August 15, 1972;

(9) Mrs. Hill also endorsed the name of "Bryan Hanks" on a number of other checks, hereinafter referred to as "other checks", totalling $31,280.19, made payable to Hanks, and deposited them in Groves' "Monte Christo Ranch" bank accounts ($28,829.06 in the Mission Bank and $2,451.13 in the Edinburg Bank) between June 4, 1971 and October 21, 1971;

(10) All of the "other checks" were issued subsequent to the date of the deed from Hanks to Groves, and were in payment for grain, citrus fruit or cotton harvested from the "Valley Lands" except a check for caliche ($94.50) and a hunting lease ($3,500.00);

(11) In endorsing and depositing all checks, Mrs. Hill was acting within the course and scope of her employment by Groves, and Groves received the benefit of those deposits.

Groves, in his first point, contends that the trial court erred in granting judgment against him and the other appellants for the conversion of all of the checks in question, save and except the USCCC check for $36,921.02, dated August 12, 1972, (the 1972 payment for Groves' participation in the Upland Cotton Set Aside Program), because actions to recover on all such checks, except the said USCCC check, were barred by the two-year statute of limitations "under the undisputed evidence and stipulations". This point involves: 1) the USCCC check for $39,123.24, deposited on August 16, 1971, for participation by Groves in the 1971 Upland Cotton Set Aside Program, and 2) the "other checks", totalling $31,280.19.

The action for the alleged conversion of the USCCC check was instituted on September 13, 1973, when Mrs. Hanks filed her first amended original petition. The action for the alleged conversion of the "other checks" was instituted on April 28, 1975, when Mrs. Hanks filed her fifth amended original petition, her trial petition.

Tex.Rev.Civ.Stat.Ann. art. 5526 (1958) provides, in part:

"There shall be commenced and prosecuted within two years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:

\* \* \* \* \* \*

2. Actions for detaining the personal property of another, and for converting such property to one's own use."

Tex.Rev.Civ.Stat.Ann. art. 5538 (1958) reads, as follows:

"In case of the death of any person against whom or in whose favor there may be a cause of action, the law of limitation shall cease to run against such cause of action until twelve months after such death, unless an administrator or executor shall have sooner qualified according to law upon such deceased person's estate; in which case the law of limitation shall only cease to run until such qualification."

It was also stipulated that Hanks died on December 18, 1972, and that Mrs. Hanks "is Independent Executrix of the Estate of Bryan Hanks". The suit was instituted on August 30, 1973 by Mrs. Hanks who stated that she brought "this suit individually and as independent executrix of the estate of 'BRYAN HANKS, deceased'".

The death of Hanks did not suspend the running of the statute of limitations. It merely tolled the running of the statute until the date that an executor or administrator of his estate was duly qualified, or until 12 months after his death, whichever was first in time. Under the facts of this case, the statute was tolled from December 18, 1972, when Hanks died, until August 30, 1973, when Mrs. Hanks, who, by that date, had already qualified as executrix of Hanks' estate.

■ The conversion, if any, of the USCCC check occurred on August 16, 1971, when it was deposited in Groves' account in the Edinburg Bank. The elapsed time from that date until December 18, 1972, was 16 months and 3 days, and from August 30, 1973 until September 13, 1973, when suit was filed asserting conversion, was 13 days. The total elapsed time from the date of the alleged conversion until suit was filed for conversion, taking into consideration the time that the running of the statute was tolled, was less than two years. Therefore, the suit for the alleged conversion of the USCCC check was not barred by the two-year statute of limitations.

■ Concerning the action for conversion of the "other checks", the elapsed time from the deposit of those checks until the death of Hanks and from August 30, 1973 until April 28, 1975, when the fifth amended original petition was filed, which, for the first time, alleged conversion of those checks, totalled more than two years from the date of conversion until suit was filed for the conversion thereof.

Tex.Rev.Civ.Stat.Ann. art. 5539b (1958), in part, provides:

"Whenever any pleading is filed by any party to a suit embracing any cause of action, cross-action, counterclaim, or defense, and at the time of filing such pleading such cause of action, cross-action, counterclaim, or defense is not subject to a plea of limitation, no subsequent amendment or supplement changing any of the facts or grounds of liability or of defense shall be subject to a plea of limitation, provided such amendment or supplement is not wholly based upon and grows out of a new, distinct or different transaction and occurrence. . . ."

In the present case, the action for conversion of the "other checks" did not grow out of the transaction set out in the original petition, which allegedly constituted conversion of a single USCCC check. Mrs. Hanks, in her fifth amended original petition, in

addition to suing for conversion of both USCCC checks, also sued for conversion of the "other checks", all of which (except the USCCC checks) were issued by different drawers, for different amounts, on different dates, and in payment of different items. The alleged conversion of the "other checks" was based upon different and distinct transactions, and therefore, barred by the applicable limitation statute. *Leonard v. Texaco, Inc.*, 422 S.W.2d 160 (Tex.Sup. 1967); *Jirovec v. Maxwell*, 483 S.W.2d 852, 856–7 (Tex.Civ.App.—Corpus Christi 1972, no writ); *Childre v. Childre*, 417 S.W.2d 464, 467 (Tex.Civ.App.—San Antonio 1967, no writ). The cause of action for the alleged conversion of the "other checks" was barred by the two-year statute of limitations.

Groves' first point as to the August, 1971 USCCC check is overruled, but it is sustained as to the "other checks".

Groves' second point of error reads, as follows:

"The trial court erred in awarding appellee judgment against each of these appellants on all of the checks in question for the reason that under the undisputed evidence and stipulations, while the checks were made payable to BRYAN HANKS, neither he, his wife nor his estate had any beneficial ownership therein, but same at all times were beneficially owned by WALLACE GROVES, and therefor, there could have been no conversion of same."

After examining the statement and argument in Groves' brief with reference to the point, we treat the same as a "no evidence" point, in that it is contended that there is no evidence that Hanks or Mrs. Hanks had any beneficial ownership in the monies represented by the checks.

The stipulations and undisputed evidence which have already been set out in our discussion generally of the suit for conversion are applicable to the disposition of this point. It is not necessary that they be repeated.

It is conclusively established that on June 2, 1971, the legal title to the "Valley Lands" was conveyed to Groves by Hanks, and from that day forward Hanks had no title, legal or equitable, to the "Valley Lands", and was not, at any time after June 2, 1971, the operator of the lands, nor was he in possession thereof, nor did he own a beneficial interest therein.

Under the provisions of the applicable regulations of the Department of Agriculture, in order for a person to participate in the Upland Cotton Set Aside Program, and to be paid any money for such participation, that person must be a producer who shares in the crops grown on the land, or in the proceeds of the sale of such crops, in the year in which application for participation was made. Hanks did not meet that requirement. He was neither producer, owner, tenant nor operator of the "Valley Lands" at the time the aforesaid USCCC checks were issued or deposited.

The governmental regulations further provided that when a person who was a producer is succeeded on the farm by another producer, the governmental payments for participation in the program for that particular year shall be divided as the purchaser and seller may agree. There is no evidence that any such agreement was ever made by and between Hanks and Groves. Hanks did not share in the crops or in the proceeds thereof at any time during the business arrangement. Payment for participation in the Upland Cotton Set Aside Program was not compensation to which Hanks was entitled in any capacity.

Under the facts developed, there is no legal basis which will support a finding, conclusion or holding that the checks constituted the personal earnings of Bryan Hanks. The USCCC checks represented payment for overall participation of the "Valley Lands" in a government price support system, and were made payable to Bryan Hanks long after he had conveyed his interest in the "Valley Lands" to Wallace Groves pursuant to the termination agreement of May 13, 1971. The "other checks" were also connected with such lands and were issued after May 13, 1971.

Clearly the parties contemplated that Bryan Hanks, from and after June 2, 1971, no longer had any right, legal or equitable, to monies derived from the property which he had previously conveyed away.

In 1964, Hanks filed with the ASCS a power of attorney, executed by him, that authorized Mrs. Hill to act in connection with all programs of the United States Department of Agriculture that affected the "Valley Lands". The instrument recited, in part:

"This power of attorney shall remain in full force and effect until written notice of its revocation has been duly served upon the Hidalgo County ASC County Committee, Edinburg, Texas."

The power of attorney was never revoked or cancelled by Hanks, as required by the termination agreement. The payments which were made in 1971 and 1972 by the USCCC were made pursuant to applications made by Mrs. Hill, and were made by the maker of the checks without written notice of either the termination agreement or of the deed from Hanks to Groves. It is certain that had Hanks seasonably cancelled the said power of attorney and so notified ASCS Committee at Edinburg, Texas, the USCCC would not have issued the checks in the name of "Bryan Hanks".

The "other checks" were issued in payment for products harvested from the "Valley Lands" by Groves subsequent to June 2, 1971, the date of the deed from Hanks to Groves, except for one check for caliche and one check for a hunting lease, which were also issued after June 2, 1971. The record supports the inference that the caliche was sold off of the "Valley Lands" and that the hunting lease covered those lands. There is no evidence that will support any inference to the contrary.

■ There were no reservations to Hanks in the deed to Groves. Therefore, all growing crops and future revenues from the "Valley Lands" were conveyed to Groves, effective June 2, 1971. *Ray v. Foutch,* 50 S.W.2d 380 (Tex.Civ.App.—Amarillo 1932, no writ); *Armstrong v. Gifford,* 196 S.W. 723 (Tex.Civ.App.—San Antonio 1917, no writ); 17 Tex.Jur.2d, Crops, § 12.

■ Conversion is the unlawful exercise of dominion and control over personal property to the exclusion or exercise of those rights by the owner, *Cantrell v. Broadnax,* 306 S.W.2d 429, 433 (Tex.Civ.App.—Dallas 1957, no writ).

■ In order for Mrs. Hanks to recover in her suit for conversion of the checks, it was necessary that she establish a right of property in the checks. 89 C.J.S. Trover & Conversion § 72–73; 14 Tex.Jur.2d, Conversion § 79. This she did not do.

Had the checks been actually delivered to Hanks, he would have been duty-bound to deliver either the checks themselves or the proceeds thereof (in the event he negotiated them) to Groves, since the termination agreement clearly shows the intent and purpose to terminate their previous business arrangement in its entirety and to vest the legal title to all properties therein described in Groves absolutely. Hanks' promise "to execute all other instruments necessary to effectuate the sense of these agreements" required that Hanks, had he received the checks, endorse the same over to Groves or account to Groves for the monies represented thereby.

■ The damages in an action for conversion are measured by the sum of money necessary to compensate the plaintiff for all actual losses or injuries sustained as a natural and proximate result of the defendant's wrong. 89 C.J.S. Trover and Conversion § 162 (1955).

■ The undisputed facts of this case show that neither Hanks nor Mrs. Hanks suffered any actual monetary loss as a result of the unauthorized endorsement of the checks and their subsequent deposit in Groves' bank account, to the exclusion of Hanks. Neither Hanks nor Mrs. Hanks had an interest, general or special, in the funds represented by the checks and never had the right to the possession of those funds. At best, Hanks had only a legal right to the possession of the checks themselves, occasioned solely by the fact that he was named

payee therein. That right is different from a legal right to the possession of the funds represented by such checks. That right did not, of itself and itself alone, furnish a legal basis for the award of $107,425.01 as damages for the conversion of those checks. Groves, being the beneficial owner of the monies represented by the check, was the only person entitled thereto. To award Mrs. Hanks such a recovery that is grounded solely on the technicality that Hanks had legal title to the checks because he was the payee named therein would amount to a windfall to Mrs. Hanks that is manifestly unjust and without regard to the beneficial ownership of the monies represented by the checks.

Mrs. Hanks did not allege or prove that she was entitled to special damages as a result of the conversion. There is no pleading or proof that she suffered a loss of profits as a result of the endorsements and deposits to Groves' accounts, nor that the loss of use of the monies resulting thereby was in any way harmful to her. 14 Tex. Jr.2d Conversion §§ 31, 32 (1960). The cause of action for conversion, if any, of the checks, at best, would be for a technical conversion, and the amount of money as damages to which Mrs. Hanks, under this record, would be entitled to, would be nominal. 89 C.J.S. Trover and Conversion § 161.

It is established by the undisputed evidence and stipulations that the beneficial ownership of the checks was in Groves at all times. Groves' second point is sustained.

## THE CROSS ACTION

■ By a trial amendment that was filed on July 10, 1975, Groves filed a cross action against Mrs. Hanks and alleged that she was indebted to him in the sum of $6,302.75, being the money on deposit "in the Continental National Bank of Fort Worth, Texas, bank account styled Bryan Hanks, Agent, Account No. 021–001–3, which said cross-defendant has in her possession". The transcript does not contain any pleadings of Mrs. Hanks with respect to the cross action. However, she states in her brief that she "pleaded a general denial and

the release clause of the dissolution contract" as defenses to the cross action. Groves, in his reply brief, does not dispute that statement. We, therefore, consider the defenses.

The "release clause" pled by Mrs. Hanks provided:

"It is mutually agreed by and between the parties that each shall and each does hereby release the other from any and all claims, causes of action and liabilities that have arisen or may hereafter arise in the future, whether known or unknown, growing out of or in any way incident to the relations of principal and agent heretofore existing between them over the period of years commencing with the execution of the Contract, it being intended by the parties that this agreement and the consideration paid and action taken hereunder shall be in full and final settlement of all accounts as between themselves."

Groves' fourth point of error reads, as follows:

"The trial court erred in failing to award to appellant WALLACE GROVES the agency bank account identified in (Stipulation 25, T.R. 60) for the reason that the undisputed evidence and stipulations discloses that BRYAN HANKS was holding said account as agent for WALLACE GROVES, and never had any actual ownership of such account, but that at all time it was beneficially owned by appellant, WALLACE GROVES."

An examination of the Statement and Argument under the point reveals that the thrust of the point is that there is no evidence to support either the finding or the conclusion by the trial court that "Wallace Groves is precluded by the contract of May 13, 1971 from asserting his $6,302.73 claim", for the reasons set out in the point itself. We so consider the point.

There is no evidence outside of the stipulations that pertains in any way to either the cross action or the defenses thereto. The only stipulations which bear on the cross action are two stipulations (25 and 32)

and the accompanying Exhibit 24 to Stipulation 32 which was introduced in evidence. The stipulations read, as follows:

"25. At the time of the death of Bryan Hanks on the 18th day of December, 1972, there existed a bank account in the Continental National Bank of Fort Worth, Texas, styled 'Bryan Hanks, agent', Account No. 021–001–3 which had a balance of $6,302.73."

\* \* \* \* \* \*

"32. Commencing prior to January 30, 1970, Bryan Hanks maintained an account in the Continental National Bank of Fort Worth, Texas, in the name of 'Bryan Hanks Agent.' A copy of the bank statements pertaining to such account, covering the time from January 30, 1970, to April 30, 1973, is attached hereto as Exhibit 24. All monies deposited in said account as reflected on said bank statements during such period, were from rents and other revenues, derived from the properties involved in the business transactions between Bryan Hanks and Wallace Groves described in Paragraph 1 above, or else were derived as an incident to the business transactions and agreement existing by and between them. Further, all the sums expended from said account were expended in the necessary furtherance of said business relationship between the parties which had existed between the parties. After the death of Bryan Hanks, Plaintiff, Virginia Margaret Wooding Hanks, withdrew said funds from the said bank without the consent of Wallace Groves and continues to hold and withhold said sum from Wallace Groves."

The several bank statements, which made up Exhibit 24, showed: 1) that from January 30, 1970 until October 2, 1972 numerous deposits were made to the account and a number of checks were written thereon; 2) on October 2, 1972, the balance in the account was $6,302.75; 3) no deposits or withdrawals were made between October 2, 1972 and April 30, 1973, the date of the last bank statement contained in the Exhibit.

The record makes no mention of the date when Mrs. Hanks withdrew the $6,302.75.

The "agency account" was in existence at the time the termination agreement was executed by Hanks and Groves. The account was not mentioned therein. The termination agreement expressly recognized that under the terms of the previously existing contract, Hanks was to act as agent for Groves in the "acquisition, operation and sale of properties" acquired by them. The stipulations show that all monies deposited in the "agency account" were derived from the "properties involved in the business transactions between Bryan Hanks and Wallace Groves", that all disbursements from the account "were expended in the necessary furtherance of said business relationship", and that Mrs. Hanks withdrew the balance after Hanks' death and without the consent of Groves. No reason is given for the withdrawal.

The "mutual release" clause, above-quoted, which Mrs. Hanks says precludes Groves from asserting any claim to the $6,302.75 balance, concerns only claims, known or unknown, which Hanks or Groves had against the other "growing out of or in any way incident to the relations of principal and agent heretofore existing between them". There is no evidence that the money on deposit in the agency account was ever claimed by Hanks for any reason.

The stipulations and Exhibit 24, when considered together, tend to negate the findings and conclusions of the trial court concerning the cross action, and will not support such findings and conclusions. Therefore, Groves' fourth point is sustained.

■ As a general rule, when a "no evidence" point is sustained, the appellate court will reverse and render the judgment of the trial court. However, it is the prerogative of the appellate court to reverse and remand the cause where it is believed that the case has not been fully developed and the ends of justice would be better served by reversing and remanding the cause for a new trial rather than to reverse and render it. That is the situation here. The cross action portion of the suit was

never fully developed, and we feel that in the interest of justice, the judgment of the trial court which denied Groves any relief on his cross action should be reversed, and the cross action remanded to the trial court for a new trial. See *Uhlhorn v. Reid*, 398 S.W.2d 169, 176 (Tex.Civ.App.—San Antonio 1965, writ ref'd n.r.e.); *Parker v. Schuler Corporation*, 379 S.W.2d 421 (Tex.Civ.App.—Eastland 1964, writ dism'd); *Kansas City Southern Railroad Company v. Guillory*, 376 S.W.2d 72, 77 (Tex.Civ.App.—Beaumont, 1964, writ ref'd n.r.e.).

Moreover, a Court of Civil Appeals is authorized by Rule 434, T.R.C.P., to reverse and remand a cause for a new trial where there is a matter of fact to be obtained, the damages to be assessed are uncertain, or the matter to be decreed is uncertain. Uncertainty enshrouds Groves' cross action and the decree rendered thereon. Since the error of the trial court affects only a part of the matters in controversy and that such part is clearly separable from the actions brought by Mrs. Hanks, and a severance would not be unfair to any party, the judgment which was rendered on the cross action will be reversed, and a new trial ordered as to the cross action.

### DISPOSITION OF THE APPEAL

The judgment insofar as it decreed that Mrs. Hanks "is entitled to the fund including interest, deposited in the Registry of the United States District Court for the Northern District of Texas, Fort Worth Division, in Cause No. CA–4–2403" is affirmed.

The judgment insofar as it decreed that Mrs. Hanks have and recover from Groves, Mrs. Hill, Gaudet and the Edinburg Bank the sum of $39,372.15, together with interest thereon as provided in the judgment, and that the Edinburg Bank have judgment over and against Groves, Mrs. Hill and Gaudet for said amount of money is reversed, and judgment is here rendered that Mrs. Hanks take nothing against those defendants, and that the Bank take nothing against Groves, Hill and Gaudet.

The judgment insofar as it decreed that Mrs. Hanks have and recover from Groves, Mrs. Hill, Gaudet and the Mission Bank the sum of $68,052.86, together with interest thereon as provided in the judgment, and that the Mission Bank have judgment over and against Groves, Mrs. Hill and Gaudet for said amount of money is reversed, and judgment is here rendered that Mrs. Hanks take nothing against those defendants, and that the Bank take nothing against Groves, Hill and Gaudet.

The cross action is severed from the actions brought by Mrs. Hanks. The judgment insofar as it denied Groves any relief on his cross action is reversed, and the cross action is remanded to the trial court for a new trial.

The costs of this appeal are taxed 50% to Groves and the other defendants (appellants), and 50% to Mrs. Hanks, the plaintiff (appellee).

AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REVERSED AND REMANDED IN PART.