**MULTI–MOTO CORPORATION, d/b/a Duncanville Suzuki, and Kenny Meazell, Appellants,**

v.

**ITT COMMERCIAL FINANCE CORPORATION, Appellee.**

No. 05–89–00992–CV.

Court of Appeals of Texas, Dallas.

Nov. 26, 1990.

Rehearing Denied Feb. 1, 1991.

---

Charles W. McGarry, Dallas, for appellants.

Robert M. O'Boyle, W. Alan Wright, Dallas, for appellee.

Before HOWELL, KINKEADE and BURNETT, JJ.

## OPINION ON REHEARING

KINKEADE, Justice.

We withdraw this Court's opinion entered on August 20, 1990, and vacate the judgment entered on that same date. Both parties filed motions for rehearing. We grant ITT's motion for rehearing in part and overrule it in part. We overrule Multi–Moto's motion for rehearing. The following is now the opinion of this Court.

Multi–Moto Corporation, d/b/a Duncanville Suzuki, and Kenny Meazell (collectively "Multi–Moto"), appeal the final judgment rendered by the trial court in favor of ITT Commercial Finance Corporation in this suit on a wholesale financing agreement and its guaranty. Multi–Moto argues that the trial court erred when it (1) refused to grant Multi–Moto's motion for judgment notwithstanding the verdict, (2) granted ITT a directed verdict on Multi–Moto's wrongful sequestration counterclaim, and (3) submitted an erroneous instruction on waiver to the jury. Multi–Moto further argues that there is insufficient evidence to support the jury's award of compensatory damages and either no evidence or insufficient evidence to support the jury's award of attorneys' fees. Because Multi–Moto failed to show the necessity of notice or present evidence of its damages incurred as a result of the alleged wrongful sequestration and ITT introduced sufficient evidence to support the jury's award of compensatory damages and attorneys' fees, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

Between 1984 and 1986, ITT, an inventory financing business, and Multi–Moto, a motorcycle retailer, entered into a wholesale financing agreement that enabled Multi–Moto to purchase directly from Suzuki an inventory of motorcycles for resale to the general public. Pursuant to this agreement, upon receipt of the motorcycles, Multi–Moto sent the invoices to ITT, which then paid Suzuki. Although the agreement provided that Multi–Moto owned the motorcycles, the agreement required that Multi–Moto grant ITT a purchase money security interest in all of its inventory. Additionally, Kenny Meazell, the president and sole shareholder of Multi–Moto, personally guaranteed the indebtedness.

The agreement provided for two separate accounts, special and regular. Under the special financing account, ITT provided a special eighteen month interest free financing arrangement that attracted Multi–Moto and allowed it to purchase and to retain the motorcycles interest free for a period of eighteen months. After the eighteen month period, payment for the motorcycles became due in full unless Multi–Moto transferred the motorcycles to a regular

account. Under the regular account, Multi–Moto paid only the interest for an additional year before payment for an unsold motorcycle became due in full. The agreement also required Multi–Moto to report all sales to ITT and to pay ITT for each motorcycle when sold. A failure to report the sale or to pay for the motorcycle when sold constituted a default. Upon default, ITT had the option to accelerate the loan for the full amount due.

In February 1986 ITT conducted a routine floor inspection of Multi–Moto's facilities to check the presence and condition of its collateral. The inspection revealed that Multi–Moto had sold $35,000 of merchandise without informing or paying ITT. Although Multi–Moto's failure to notify ITT of the sales and failure to pay constituted a default, ITT did not call the loan due at that point but instead allowed Multi–Moto to pay for the merchandise at that time and then continue operations. Initially, Multi–Moto issued a $35,000 check to ITT, which the bank returned for insufficient funds. Although unclear from the record, Multi–Moto apparently then deposited funds in its account, after which the bank honored the $35,000 check. At this time, ITT instituted a new payment procedure for Multi–Moto to follow in an attempt to avoid similar occurrences in the future.

On September 23, 1986, Multi–Moto wrote ITT a check for $3385 to pay for motorcycles it had sold. On October 14, 1986, after the bank returned that check because of insufficient funds, ITT conducted another floor inspection. This inspection revealed that Multi–Moto had not informed ITT of an additional $6547 worth of motorcycles it had sold. Upon further investigation, ITT determined that Multi–Moto also owed $2275.34 in insurance and interest payments to ITT and that $20,429.50 worth of Multi–Moto's merchandise had become payable in full.

On October 17, 1986, Multi–Moto sent ITT a cashier's check for $3385 to replace the previous insufficient funds check and a regular check for the $6547. The bank returned this latter check due to insufficient funds. On October 22, 1986, after the

return of this last check and a complete review of Multi–Moto's file, ITT notified Multi–Moto that it intended to accelerate the loan and wanted to pick up the motorcycles. The terms of the agreement required Multi–Moto to voluntarily release the merchandise to ITT upon request. On October 28, 1986, ITT sued Multi–Moto under the agreement for $313,562.84, and on October 29, 1986, after Multi–Moto failed to voluntarily release the motorcycles, ITT obtained a temporary restraining order and an order for a writ of sequestration. The restraining order prohibited Multi–Moto from interfering with the execution of the writ and from selling, disposing of, or transferring the motorcycles.

On October 31, 1986, the constable executed the writ and seized 155 motorcycles. ITT transferred these motorcycles to Suzuki. Subsequently, ITT learned that the constable had failed to take possession of approximately thirty motorcycles, that Multi–Moto had transferred these motorcycles to a storage facility, and that Multi–Moto had apparently sold some of these motorcycles to a third party in violation of the restraining order. On December 19, 1986, ITT obtained a second temporary restraining order and an order for a second writ of sequestration. On December 24, 1986, the constable executed this second writ and recovered the remaining twenty-seven motorcycles relocated by Multi–Moto and placed them in storage. Several months later, ITT also transferred these motorcycles to Suzuki.

## PROPER NOTICE OF SALE

In its first point of error, Multi–Moto contends that the trial court erred when it overruled Multi–Moto's motion for judgment notwithstanding the verdict. Multi–Moto argues that the transfer to Suzuki of the motorcycles seized pursuant to the second writ of sequestration constituted a private sale and that ITT failed to establish that it gave Multi–Moto proper notice of that alleged sale as required by the Texas Business and Commerce Code. *See* TEX. BUS. & COM.CODE ANN. § 9.504(c) (Vernon Supp.1991).

A court may grant a motion for judgment notwithstanding the verdict when: (1) a defect specifically identified in the nonmovant's pleading makes it insufficient to support a judgment; (2) the truth of fact propositions, under the substantive law, establishes the right of the movant; or (3) the evidence is insufficient to raise an issue as to one or more fact propositions which the nonmovant must establish for the court to render judgment in its favor. *Rowland v. City of Corpus Christi*, 620 S.W.2d 930, 932–33 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.). When the trial court overrules a motion for judgment notwithstanding the verdict, this Court must consider the evidence in a light most favorable to the jury finding, considering only the evidence and the inferences that support the verdict and rejecting any contrary evidence and inferences. *Fenwal, Inc. v. Mencio Security, Inc.*, 686 S.W.2d 660, 663 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.).

Ordinarily, when a secured party disposes of collateral, it must give notice to the debtors. An exception to this rule occurs when the collateral transfers under a repurchase agreement or the like. *Bexar County Nat'l Bank of San Antonio v. Hernandez*, 716 S.W.2d 938, 938–39 (Tex. 1986); *see* TEX.BUS. & COM.CODE ANN. § 9.504(c) & (e) (Vernon Supp.1991).

In consideration for ITT's grant of financing to Multi–Moto, Suzuki executed a repurchase agreement with ITT. Upon ITT's written request, this repurchase agreement obligated Suzuki to repurchase Multi–Moto's special inventory merchandise at 100 percent of the original invoice price. Subsequent to obtaining the first writ of sequestration, ITT sought an order to allow the pretrial disposition of the sequestered property. ITT asserted that the property consisted primarily of motorcycles that would greatly depreciate in value due to the passage of time pending a final disposition of the cause. The trial court granted the order allowing ITT to transfer the property under any repurchase agreements and to liquidate the remainder under applicable law. Pursuant to the repur-

chase agreement, ITT transferred all of the motorcycles seized under the first writ of sequestration to Suzuki. Multi–Moto does not challenge that Suzuki repurchased the motorcycles seized pursuant to the first writ of sequestration.

After the execution of the second writ of sequestration, ITT stated that it entered into negotiations with Suzuki concerning the repurchase of the motorcycles seized thereunder. Multi–Moto had carried all of the motorcycles seized pursuant to this second writ in its regular account. Although the original repurchase agreement with Suzuki only obligated Suzuki to repurchase the special account inventory, Suzuki had the option to also repurchase the regular account inventory. Pursuant to the negotiations with ITT, Suzuki eventually repurchased the motorcycles seized as a result of the second writ of sequestration under the identical terms as it had repurchased the motorcycles seized as a result of the first writ of sequestration. Additionally, Multi–Moto stipulated at trial that whether the purchase of the second group of motorcycles constituted a repurchase by Suzuki was a question of law for the court to decide. Since Multi–Moto neglected to obtain a ruling from the trial court as to whether the transfer constituted a repurchase of the motorcycles, this Court "must affirm the judgment of the trial court on any legal theory that finds support in the evidence." *In the Interest of W.E.R.*, 669 S.W.2d 716, 717 (Tex.1984).

Reviewed in a light most favorable to the jury finding and considering only the evidence and the inferences that support the verdict, the evidence shows that Suzuki could have felt itself obligated to accept the transfer of these motorcycles from ITT pursuant to the original repurchase agreement. The Texas Business and Commerce Code specifically provides that a secured party's transfer of collateral pursuant to a repurchase agreement is not a sale or disposition subject to its provisions. *See* TEX. BUS. & COM.CODE ANN. § 9.504(e) (Vernon Supp.1991). Because Multi–Moto failed to establish the necessity of notice, the trial court correctly overruled Multi–Moto's mo-

tion for judgment notwithstanding the verdict. We overrule Multi–Moto's first point of error.

## WRONGFUL SEQUESTRATION

In its second point of error, Multi–Moto contends that the trial court erred when it granted ITT's directed verdict as to Multi–Moto's counterclaim for wrongful sequestration. Multi–Moto argues that ITT did not have reasonable grounds to believe the facts alleged in the affidavit used to secure its writ of sequestration. Multi–Moto further argues that it presented sufficient evidence of damages to support its counterclaim.

■ A court may grant a directed verdict when the evidence presented, viewed in the light most favorable to the nonmovant and after the court indulges every reasonable inference in the nonmovant's favor, raises no material fact issues. *Anderson v. Moore*, 448 S.W.2d 105, 105–06 (Tex. 1969); *Guy v. Stubberfield*, 666 S.W.2d 176, 178 (Tex.App.—Dallas 1983, no writ). To succeed on its counterclaim for wrongful sequestration, Multi–Moto must establish that (1) ITT did not have reasonable grounds to believe that Multi–Moto might conceal, dispose of, ill-treat, waste, or destroy the motorcycles as alleged in the affidavit used to secure the writ of sequestration and (2) Multi–Moto suffered damages as a result of ITT's execution of the writ. *Edmondson v. Carroll*, 134 S.W.2d 378, 385 (Tex.Civ.App.—Fort Worth 1939, writ dism'd judgm't cor.).

■ As part of the final judgment, the trial court granted ITT's motion for directed verdict on Multi–Moto's counterclaim for wrongful sequestration after making a determination that Multi–Moto presented no evidence of damages arising out of the alleged wrongful sequestration. A wrongful sequestration results in the conversion of property. *See Bloodgood v. B & L Sales Co.*, 436 S.W.2d 398, 399 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). In an action for wrongful conversion the measure of damages is the sum of money necessary to compensate the plaintiff for all of its actual losses or injuries sustained as a natural and proximate result of the defendant's wrong. Tex.Civ. Prac. & Rem.Code Ann. § 62.045(a)(3) (Vernon Supp.1991); *see Groves v. Hanks*, 546 S.W.2d 638, 647 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.).

■ At trial, Multi–Moto attempted to call George Fettinger, a certified public accountant, to testify to the damages it allegedly suffered as a result of the wrongful sequestration. Prior to trial, ITT asked Multi–Moto in an interrogatory to designate any experts it intended to call to testify as to its alleged damages. Multi–Moto failed to do so. Therefore, ITT objected to Multi–Moto's attempted use of Fettinger or anyone else as a damages expert. Further, Multi–Moto failed to present any evidence of "good cause" why it had not designated a witness to testify as to its damages. When a party fails to show good cause for its failure to designate a witness in response to a properly propounded interrogatory, then the court should exclude that witness's testimony. *Gutierrez v. Dallas I.S.D.*, 729 S.W.2d 691, 693 (Tex.1987).

■ Multi–Moto argues that it established the amount of its actual damages through Meazell's testimony and ITT's admissions at trial. *See Bloodgood*, 436 S.W.2d at 400; *Garlington v. Cotten*, 189 S.W. 294, 295 (Tex.Civ.App.—Texarkana 1916, no writ). Meazell testified as to his opinion of the retail and wholesale value of the sequestered motorcycles. Additionally, Multi–Moto contends that ITT's admission that the motorcycles sustained $388.97 worth of damages between the time ITT last inspected them and when Suzuki repurchased them was evidence of Multi–Moto's damages. Multi–Moto further contends that ITT's admission that the motorcycles depreciated in value while in storage was also evidence of its actual damages.

Multi–Moto misplaces its reliance on *Bloodgood* and *Garlington*. In both of those cases, the complaining party had already paid in full for the sequestered property. *Bloodgood*, 436 S.W.2d at 400; *Garlington*, 189 S.W. at 295. In the present case, Multi–Moto never paid for the motor-

cycles. ITT never obligated Multi–Moto to pay any principal on the inventory until after the inventory was sold. Further, Multi–Moto never established that the damages that the motorcycles sustained after their last floor inspection by Suzuki occurred as a result of the subsequent sequestration. Additionally, although ITT asserted that the motorcycles depreciated while in storage, no dollar figure was placed on this depreciation. Even viewing Meazell's testimony and ITT's admissions in the light most favorable to Multi–Moto, without additional expert testimony, the evidence was insufficient to establish that Multi–Moto incurred any actual damages. Because Multi–Moto failed to establish that it incurred any actual damages, the trial court correctly granted ITT's motion for directed verdict as to Multi–Moto's counterclaim for wrongful sequestration. We overrule Multi–Moto's second point of error.

### ERRONEOUS JURY INSTRUCTION

In its third point of error, Multi–Moto contends that the trial court erred when it submitted an erroneous instruction on waiver to the jury. Multi–Moto argues that the trial court should have instructed the jury on waiver of strict compliance rather than waiver of the entire loan agreement.

Both the parties and the court chose to submit waiver as an instruction controlling the issue of default rather than as a separate special issue. The instruction submitted by the court to the jury read as follows:

> You are hereby instructed that Multi–Moto Corporation defaulted under its loan agreement with ITT unless ITT *waived* the loan agreement. You are also instructed that *waiver*, as that word is used in this written question means the intentional or voluntary relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such a right.

(Emphasis in original.) Multi–Moto objected to this instruction on the ground that it directs a verdict for ITT unless ITT waived the entire loan agreement. Multi–Moto further objected to this instruction on the ground that Multi–Moto only claimed a waiver of "strict compliance" implied from a course of conduct, and the existence of such a course of conduct entitled Multi–Moto to (1) advance notice that ITT would require strict compliance in the future, and (2) a reasonable opportunity to cure any default. Multi–Moto requested the court replace the above instruction with the following:

> A party, who accepts a course of performance or conduct of a contract that is not in strict compliance with the terms of a contract, waives the right to declare a default with respect thereto. In such a situation, the party who has not insisted upon strict compliance in the past, before he can declare a default for a subsequent failure to perform by the other party of the same nature, must give notice to the other party that strict compliance with the terms of the contract will be demanded in the future, and must furthermore give the other party a reasonable period of time to cure any then-existing breaches of the same nature.

The Texas Rules of Civil Procedure require the trial court to "submit such explanatory instructions and definitions as shall be proper to enable the jury to render a verdict." TEX.R.CIV.P. 277. This rule gives the trial court considerable discretion in deciding which instructions are necessary and proper when submitting issues to the jury. *Security Sav. Ass'n v. Clifton*, 755 S.W.2d 925, 933 (Tex.App.—Dallas 1988, no writ). A proper instruction finds support in the evidence or in the inferences drawn from the evidence and aids or assists the jury in answering the issues submitted. *Miller v. Miller*, 700 S.W.2d 941, 952 (Tex.App.—Dallas 1985, writ ref'd n.r. e.). No abuse of discretion occurs absent the showing of a denial of a party's rights that was reasonably calculated to cause and probably did cause rendition of an improper verdict. *Security Sav.*, 755 S.W.2d at 933. In determining whether an abuse of discretion has occurred, this Court may not substitute its judgment for that of the trial court, and instead this Court must

decide only whether the trial court's action was arbitrary or unreasonable. *Landry v. Traveler's Ins. Co.*, 458 S.W.2d 649, 651 (Tex.1970); *K–Mart Corp. v. Trotti*, 677 S.W.2d 632, 636 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

 The evidence showed that after the bank dishonored Multi–Moto's check in February 1986, ITT introduced new payment procedures for Multi–Moto to follow. Multi–Moto alleged that these procedures, as well as ITT's acceptance of cashier's checks after the bank had dishonored Multi–Moto's checks for insufficient funds, constituted a new course of conduct. However, ITT stated that it introduced these procedures in an attempt to work out an arrangement so that the parties could continue to do business and that the agreement provided for this. ITT further stated that under the agreement Multi–Moto's action constituted a default. ITT stated the decision to waive this default and attempt a workout arrangement did not mean that it waived, or intended to waive, its right to take action on future defaults. Further, paragraph fifteen of the financing agreement provided that ITT's failure to take action when Multi–Moto defaulted did not prevent ITT from taking, or waive ITT's right to take, action as to any default or any later default. Although Multi–Moto alleged that ITT caused the last two defaults by not holding Multi–Moto's checks as promised, ITT stated that it never agreed to hold checks until Multi–Moto deposited funds into its account.

The evidence, and reasonable inferences drawn therefrom, show that ITT's change of payment procedures did not constitute a new course of conduct. ITT specifically included in the agreement the right to enter into a workout arrangement with Multi–Moto without relinquishing the right to declare a default in the future. Under Multi–Moto's theory of strict compliance, ITT would waive its right to strict compliance as to the payment procedure. Its theory would also waive the right to declare future defaults unless the parties significantly modified the agreement. The language of Multi–Moto's proposed instruc-

tion contained no clear definition of waiver. The proposed instruction failed to aid and assist the jury in understanding the legal concept of waiver and the effect of applicable law and presumptions. Additionally, Multi–Moto's instruction called undue attention to its affirmative defenses. *See Security Sav.*, 755 S.W.2d at 933; *Southern Pac. Transp. Co. v. Garrett*, 611 S.W.2d 670, 674 (Tex.Civ.App.—Corpus Christi 1980, no writ). Because Multi–Moto has failed to show that the trial court abused its discretion, the trial court did not err when it submitted ITT's waiver instruction rather than Multi–Moto's course of conduct instruction. We overrule Multi–Moto's third point of error.

## SUFFICIENCY OF THE EVIDENCE

### Compensatory Damages

In its fourth point of error, Multi–Moto contends that ITT's evidence as to compensatory damages was insufficient to support the jury's award because ITT failed to (1) establish that Multi–Moto proximately caused ITT's damages, (2) mitigate its own damages, or (3) show the reasonableness of the constable's fees and various costs of storage. First, Multi–Moto argues that the entire deficiency resulted from missing parts, and since the parts could have been lost after sequestration, ITT failed to prove Multi–Moto caused the deficiency when it did not inspect the motorcycles and record any damages at the time of sequestration. Second, Multi–Moto argues that ITT failed to mitigate its damages because under ITT's repurchase agreement with Suzuki, Suzuki agreed to pay 100 percent of the interest; insurance; returned check charges; dealer's net cost for each repossessed motorcycle, less any amount for damages; and any storage charges incurred thirty days after receiving the request for repurchase. Therefore, ITT should have first sought reimbursement for the constable's fee, including storage charge, and its attorneys' fees from Suzuki, and its failure to do so evidenced ITT's lack of diligence. With this last argument, Multi–Moto essentially asserts that it was a beneficiary of the repurchase

agreement between ITT and Suzuki. *MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 10–12 (Tex.App.—Dallas 1988, writ denied).

In examining an insufficient evidence point, the court must examine the entire record as a whole, including any evidence contrary to the judgment. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). The court may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). In order to establish its right to recover compensatory damages ITT needed to prove that it suffered some pecuniary loss as a result of Multi–Moto's breach. *Braselton-Watson Builders, Inc. v. C.B. Burgess*, 567 S.W.2d 24, 28 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Stewart v. Basey*, 150 Tex. 666, 670, 245 S.W.2d 484, 486 (1952).

Rule 699 of the Texas Rules of Civil Procedure provides that only a sheriff or constable shall execute the writ of sequestration, take into his possession the property described in the application or affidavit, and keep the same subject to further orders of the court. TEX.R.CIV.P. 699. The rules that govern writs of sequestration are similar to those that govern writs of attachment. *Compare* TEX.R.CIV.P. 696–716 *with* TEX.R.CIV.P. 592–609; *Lawyers Civil Process, Inc. v. State ex rel. Vines*, 690 S.W.2d 939, 943 (Tex.App.—Dallas 1985, no writ). Neither party controls the manner in which the constable shall perform his obligation of looking after the property. Further, the constable acts as neither the agent nor the servant of either party. *Sorrells v. Irion*, 216 S.W.2d 1021, 1023 (Tex.Civ.App.—Amarillo 1948, writ dism'd). The statute that addresses compensation for constables fixes no fee for the care of the property by them, but it does provide for reasonable charges as allowed by the court. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 62.062(a) (Vernon 1986).

The claimant has the burden to prove the reasonableness of expenses and evidence of the amount paid is generally insufficient to establish such reasonableness. *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 238 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). At trial, ITT established that Multi–Moto defaulted under the agreement, and as a direct result of Multi–Moto's refusal to voluntarily release the motorcycles, ITT sought and obtained two writs of sequestration. Pursuant to the second writ, ITT had the constable seize the twenty-seven motorcycles and store them for approximately three months prior to delivery to Suzuki for repurchase. ITT introduced evidence that it expended $12,-350.74, after reimbursement from Suzuki, for the constable's fee, which included charges for hauling the property to the warehouse, warehouse handling, three months' storage, and access to the storage. However, ITT introduced no evidence of the reasonableness of these expenses.

ITT had a duty to minimize its loss. However, Multi–Moto had the burden to prove the extent to which ITT mitigated or could have mitigated its damages. *Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 806 (Tex.App.—Dallas 1987, no writ). Therefore, Multi–Moto had to prove (1) lack of diligence on the part of ITT and (2) the amount by which ITT increased Multi–Moto's damages by its failure to mitigate. *Cocke v. White*, 697 S.W.2d 739, 744 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). The court presumes that parties contract for themselves, and not for the benefit of a third party, unless the contract states a clear intention to contract for a benefit to the third party. If any reasonable doubt exists as to an intent to confer a direct benefit, the third party beneficiary claim must fail. The courts will not create a third party beneficiary contract by implication. *MJR*, 760 S.W.2d at 10–12.

Pursuant to the repurchase agreements with Suzuki, ITT requested that Suzuki repurchase the motorcycles and pay for a portion of the storage fees, which it did. The repurchase agreement between ITT and Suzuki did not confer a direct benefit on or reference Multi–Moto in any way. ITT introduced evidence which showed that, following Suzuki's re-

purchase under the agreement, Multi–Moto owed a total deficiency of $399.74, $390.97 for the special term inventory and $8.77 for the regular inventory. Since the repurchase agreements between ITT and Suzuki neither conferred a direct benefit on nor in any way referenced Multi–Moto, Multi–Moto misplaces its reliance on that agreement for its proposition that ITT failed to mitigate its damages. At most Multi–Moto was an incidental beneficiary of the repurchase agreement and as such had no right to enforce the agreement against either ITT or Suzuki. *See MJR*, 760 S.W.2d at 10. Therefore, ITT had no obligation to Multi–Moto to seek reimbursement from Suzuki first. ITT merely had to show that Multi–Moto breached the financing agreement and that a deficiency remained after Suzuki repurchased the goods. ITT did both. The burden then shifted to Multi–Moto to plead and to prove ITT's failure to mitigate. *See Town East Ford*, 730 S.W.2d at 806. Multi–Moto raised failure to mitigate for the first time on appeal. Further, Multi–Moto failed to show the amount, if any, by which ITT increased Multi–Moto's damages by the alleged failure.

■ After examining the record as a whole, we find that ITT introduced sufficient evidence to show that Multi–Moto owed a deficiency of $399.74. Since ITT failed to establish the reasonableness of the constable's fee or storage charge, the evidence is insufficient to support these damages. We sustain Multi–Moto's fourth point of error only as to ITT's failure to establish the reasonableness of the unreimbursed $12,350.74 constable's fee and included storage charge.

### Attorneys' Fees

■ In its fifth point of error, Multi–Moto argues that ITT introduced no evidence to support the jury's award of attorneys' fees or that the evidence was insufficient because it failed to identify the attorney's legal assistants, their qualifications, the work they performed, or the customary and reasonable charge for legal assistants' work. A party may separately assess and include in the award of attorneys' fees compensation for a legal assistant's work, if that assistant performs work traditionally done by an attorney. In order to recover such amounts, the evidence must establish: (1) the qualifications of the legal assistant to perform substantive legal work; (2) that the legal assistant performed substantive legal work under the direction and supervision of an attorney; (3) the nature of the legal work performed; (4) the legal assistant's hourly rate; and (5) the number of hours expended by the legal assistant. *Gill Sav. Ass'n v. International Supply Co.*, 759 S.W.2d 697, 702 (Tex.App.—Dallas 1988, writ denied).

■ On appeal, when the court reviews a no evidence challenge, it considers only the evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, support the jury verdict. The court must disregard all evidence and inferences contrary to the fact finding. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). The instruction accompanying the jury question on attorneys' fees informed the jury that in setting a reasonable attorneys' fee they could consider the following factors: (1) the nature of the case, its difficulties, complexities, and importance; (2) the nature of the services required to be rendered by the attorneys; (3) the amount of money involved, the client's interest at stake, and the benefit derived by the client; and (4) the time reasonably spent by the attorneys, the responsibility imposed upon counsel, and the skill reasonably needed to perform the services. ITT introduced testimony that it had incurred $65,000 in attorneys' fees up until the first day of trial, that this was a reasonable fee for the services rendered, and that its attorneys charged $110 an hour for the work performed at trial. ITT also introduced detailed billing records, which delineated the work performed, the person performing the work by their initials and their hourly rate, the time spent performing the work, and a final total. Viewing this evidence in the light most favorable to the jury verdict, ITT produced some evidence to support the jury's award of attorneys' fees.

In examining an insufficient evidence point, the court must examine the entire record as a whole, including any evidence contrary to the judgment. *Plas–Tex,* 772 S.W.2d at 445. The court may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 176. ITT admitted to the inclusion of legal assistants' time and stated that those assistants did those things that an attorney does not necessarily need to do. Multi–Moto objected to the use of the phrase "reasonably and fairly compensate" in jury question three and instead requested that the question include the words "reasonable and necessary attorneys' fees." The court denied Multi–Moto's request. Multi–Moto further objected that no proof existed concerning the qualifications and skills of the attorneys or their legal assistants. However, Multi–Moto failed to specifically object to the jury instruction or request an instruction that the jury could only include the legal assistant's time if the evidence established the legal assistant's qualifications, that they performed substantive legal work under an attorney's supervision, the nature of the work they performed, their hourly rate, and the number of hours they expended on the work. *See Gill Savings,* 759 S.W.2d at 702. After reviewing the entire record as a whole, we find that the jury verdict in light of the instruction given was not contrary to the overwhelming weight of the evidence. Although ITT's evidence as to attorneys' fees failed to specifically identify the legal assistants or their qualifications, the jury was not asked to take this into consideration when setting a reasonable attorneys' fee. Because ITT introduced sufficient evidence of its attorneys' fees, we overrule Multi–Moto's fifth point of error.

## CONCLUSION

Since ITT failed to introduce sufficient evidence of the reasonableness of the constable's fee and the included storage charge, we modify and reform the trial court's judgment to grant ITT only $4516 for compensatory damages. We affirm the trial court's judgment in all other respects.